Alfred C. COLE and Janis E. Cole, Plaintiffs–Respondents,

v.

FERRELL–DUNCAN CLINIC, Defendants–Appellants.

No. 26731.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 31, 2006.

Motion for Rehearing and Transfer Denied Feb. 22, 2006.

Application for Transfer Denied April 11, 2006.

Susan Ford Robertson, Ford, Parshall & Baker, Columbia, MO, for appellant.

David W. Ansley and Deborah K. Dodge, Hall, Ansley, Rodgers & Condry, P.C., Springfield, MO, for respondent.

KENNETH W. SHRUM, Presiding Judge.

Alfred C. Cole ("Alfred") and Janis E. Cole (collectively called Plaintiffs) sued Ferrell–Duncan Clinic, Inc. ("Defendant") for medical negligence and loss of consortium. Their suit was filed April 15, 2003. They alleged, *inter alia*, that Dr. Jack Mantell (a physician employed by Defendant) negligently failed to inform Alfred about PSA tests (for prostate cancer detection) and negligently failed to order PSA tests when Alfred went to Dr. Mantell for physical exams on December 8, 1997, and January 27, 1999; that in October 2002, Alfred was diagnosed with prostate cancer; that when Alfred saw Dr. Mantell for physical examinations in 1997 and 1999, he had a material chance of recovery from prostate cancer, but Dr. Mantell's negligence caused Alfred to lose part of his material chance of recovery.[1]

Defendant timely objected to evidence and jury instructions about Alfred's 1997 and 1999 visits with Dr. Mantell. It did so on the grounds that any part of Plaintiffs' claim arising from those visits was time

---

1. The record shows that a "PSA test" is a blood analysis that checks for "prostate specific antigen." This antigen is an enzyme that the prostate makes and secretes into the prostatic fluid and into the bloodstream, at least to a certain extent. A PSA test measures the enzymes in the blood stream. PSA levels below a certain defined range indicate less likelihood of prostate cancer, whereas if the PSA level is above the four-unit threshold, "likelihood or risk of prostate cancer is felt to be significant."

barred (§ 516.105)[2]. The court overruled Defendant's objections.

After a jury verdict favorable to Plaintiffs, Defendant appealed. The sole issue is whether the "continuing care" exception to the statute of limitations (§ 516.105) applied here, thus allowing the jury to consider evidence that section 516.105 would otherwise have made inadmissible. Finding no error in the trial court's rulings, we affirm.

Defendant is a health care entity that provides health care to people in the southwest Missouri area. As of 2001, it employed about 100 physicians. Beginning December 8, 1997, and continuing through February 4, 2003, Alfred used some of Defendant's physicians for his healthcare. He started in December 1997 with Dr. Jack Mantell (Defendant's employee) as his primary care physician.

Plaintiffs originally contacted Dr. Mantell "and asked if he would take [them] as patients" after Alfred's employer (Burlington Northern Railroad) changed insurance programs and they (Plaintiffs) had to get a primary care physician. After Dr. Mantell agreed to be his physician, Alfred began having Dr. Mantell do periodic physical examinations of him. As Alfred worded it, he wanted Dr. Mantell to "have the chance" of identifying "what risks [he] might be facing relative to [his] health," including "early detection of cancer."

Alfred first saw Dr. Mantell on December 8, 1997, when he was sixty-one years old. The history given Dr. Mantell included that Alfred suffered from "nocturia [urinating at night] one to two times." As a part of the physical, Dr. Mantell did a digital rectal exam. The purpose was to check Alfred's prostate gland, i.e., feel its size, texture, roughness, and symmetry. This was done because abnormality in the prostate can indicate cancer in the gland. Dr. Mantell's December 8 record of Alfred's exam read "[p]rostate is small, no irregularity."

On January 27, 1999, Dr. Mantell made another of his periodic examinations of Alfred. As before, this included a digital rectal exam. This time Dr. Mantell found Alfred's prostate "normal." Dr. Mantell next saw Alfred October 20, 2000. On that date, Dr. Mantell reported that Alfred's prostate was "small." Dr. Mantell's final examination of Alfred was on August 28, 2001. During that exam, Dr. Mantell told Alfred his prostate was a "little enlarged."

Alfred testified that during the years he used Dr. Mantell for routine checkups, he was unaware that blood tests were available to screen for prostate cancer. Although Dr. Mantell had blood drawn from Alfred on some occasions for various reasons, he conceded he never ordered PSA testing of Alfred's blood, nor did he discuss this with Alfred. Dr. Mantell testified he did not normally inform his patients about PSA testing unless they brought up the topic with him. His reasons for not routinely doing a PSA test of Alfred's blood were the risk of false positive and false negative results and infections.

After Dr. Mantell retired in September 2001, Alfred started using Dr. John Waites (another physician employee of Defendant) as his primary care provider. When Dr. Waites first saw Alfred on July 3, 2002, he started the prostate health part of the exam by ordering PSA testing. The results showed Alfred's PSA was "significantly elevated to 30.4."

Alfred was referred to another of Defendant's employees, Dr. Peter Trinca, a urologist. Biopsied tissue from Alfred's prostate was positive for cancer and later tests

2. All statutory references are to RSMo (2000) unless otherwise stated.

revealed the cancer had spread to surrounding tissues.

Ultimately, Alfred went to The Mayo Clinic where his prostate cancer was treated surgically. Following surgery, Alfred was given hormone therapy, but was told "there is a likelihood that [his cancer] will return." Medical expert, Dr. Finkel, testified that Dr. Mantell deviated from the accepted standard of care in failing to inform Alfred of PSA testing availability. Other medical experts testified that had Dr. Mantell offered a PSA test in 1997 and 1999, it would have shown an elevated prostate antigen level; that a biopsy would have disclosed cancer, and prompt treatment would have kept the cancer from spreading outside the prostate. Consequently, he would not have lost sexual function, he would be at a stage T1 rather than stage T3B in his cancer development, and the chance of cancer reoccurrence for Alfred would be much less.

At trial Defendant repeatedly objected that the jury should not hear about or be instructed it could find negligence based on any pre-April 15, 2001, facts. Defendant's objections and arguments were based on the two-year time limit prescribed by section 516.105 for medical malpractice claims. The trial court, however, overruled all such objections. It based its ruling on the so-called "continuing care" exception to section 516.105.[3] The jury found for Plaintiffs and awarded them damages. This appeal followed.

The "continuing care" exception to section 516.105 was first recognized in Missouri in *Thatcher v. De Tar*, 351 Mo. 603, 173 S.W.2d 760 (1943). There, the defendant doctor left a surgical needle in the plaintiff during an appendectomy (performed August 25, 1937) and did not find it during the period he provided post-surgical care (which was until October 1939). Thatcher's malpractice suit was filed August 29, 1941. His petition charged defendant with negligence for (1) leaving the needle, (2) failing to properly treat plaintiff thereafter, and (3) not finding the needle during post-surgery treatment. The trial court ruled Thatcher's claim was time barred. The Supreme Court of Missouri disagreed, saying: "Taking a common sense view of the situation, and one in harmony with justice, the conclusion seems apparent that the statute of limitations did not begin to run against plaintiff until the treatment by the defendant ceased." *Id.* at 762.

The "continuing care" exception remains as a part of Missouri law. This court has said it applies "when the treatment which continues is of such a nature as to charge the defendant with the duty of continuing care and treatment which is essential to recovery." *Reynolds v. Dennison*, 981 S.W.2d 641, 642[1] (Mo.App.1998). The "continuing care" duty lasts "unless the physician-patient relationship is ended by (1) mutual consent of the parties, (2) the physician's withdrawal after reasonable notice, (3) dismissal of the physician by the patient, or (4) the cessation of the necessity that gave rise to the relationship." *Weiss v. Rojanasathit*, 975 S.W.2d 113, 119–20[11] (Mo.banc 1998).

The public policy that drives the continuing care exception is explained in *Shaw v. Clough*, 597 S.W.2d 212 (Mo.App.1980):

"By its very nature, the tolling exception to the bar of limitation rule rings

---

3. In relevant part, section 516.105 provides: "All actions against physicians, hospitals ... and any other entity providing health care services and all employees of any of the foregoing acting in the course and scope of their employment, for damages for malpractice, negligence, error or mistake related to health care shall be brought within *two years from the date of occurrence of the act* of neglect complained of. . . . " (Emphasis supplied.)

out with logic, with morality and with 'common sense' as recognized in *Thatcher*. The doctor-patient relationship is in most instances a highly personal and close one, encompassing on the part of the patient a basic confidence and reliance upon the skills and judgment of the doctor with a reasonable expectation that such will be met by a deep sense of obligation and proper exercise by the doctor of his incomparable superior knowledge and the dedicated use of his best talents and judgment. If he is careless or negligent in his treatment of his patient, and his patient suffers injury and damage, he, like all others, whether professional or lay, can be held responsible under civil law for his actions."

. . . .

"The rationale of the decisions in *Thatcher* and other jurisdictions adopting this exception are based upon the concept that it stems primarily from the nature of the relationship and that the obligation and treatment be considered as a 'whole' until it ceases and the obligations arising therefrom should not be conceptually fragmented."

*Id.* at 215–16.

■ Defendant acknowledges the continuing care exception, but avers it has no application here. Defendant argues Alfred never alleged nor tried to prove that Dr. Mantell was providing treatment for prostate cancer or was providing treatment essential to recovery with respect to any condition of Alfred's prostate. Continuing, Defendant asserts Alfred "was not going back . . . on December 8, 1997, and January 27, 1999 for treatment necessary for a condition or complication caused by Dr. Mantell and he was not undergoing treatment necessary for recovery of any condition." With this as its premise, Defendant maintains the continuing care exception simply does not apply here and that the trial court erred when it ruled that it did. This court disagrees.

Alfred testified he asked Dr. Mantell to see him periodically so he (Dr. Mantell) would "have the chance" of identifying "what risks [he] might be facing relative to [his] health." Dr. Mantell accepted Alfred as his patient. He did the first of several periodic physical examinations of Alfred on December 8, 1997. He continued this for Alfred until he (Dr. Mantell) retired in 2001.

Each of Alfred's periodic physicals included a digital rectal examination by Dr. Mantell. Its purpose was to detect abnormalities, if any, in the prostate gland. As Dr. Mantell explained it, an abnormality could indicate an infection, a benign hypertrophy, or cancer. The prostate part of each exam was not something Alfred specifically asked be done; it was a screening examination that Dr. Mantell undertook as part of a health care management program he performed for Alfred.

With that as background, we start with Defendant's assertion that Alfred did not see Dr. Mantell on December 8, 1997, or on January 27, 1999, for "treatment" of a condition that was "essential to recovery;" consequently the "continuing care" exception was not implicated. The first question this argument raises is whether the prostate exam that Dr. Mantell did as part of his periodic examination of Alfred was a "treatment" as that term was used in *Thatcher*. We answer, "Yes."

In analyzing the "continuing care" exception, this court has said that " '[t]reatment includes measures necessary for the physical well being of the patient.' " *Reynolds*, 981 S.W.2d at 642 n. 1. Also, "treatment" has been described as "covering all the steps taken to effect a cure of an injury or disease; *including examination and diagnosis* as well as application of

remedies." (Emphasis supplied.) BLACK'S LAW DICTIONARY, 1502 (6th ed.1990). From this, we conclude that Defendant (through Dr. Mantell) began "treatment" of Alfred on December 8, 1997, within the meaning of that term as envisioned by *Thatcher* and its progeny. Specifically, examination of Alfred's prostate gland was "treatment" in that early detection of prostate cancer was a "measure[ ] necessary for the physical well being of [Alfred]" and an important step toward its cure or containment.

The second issue raised by Defendant's argument is whether Dr. Mantell's "treatment" of Alfred, i.e., periodic prostate exam to detect the possible presence of cancer, was "essential to [his] recovery." Defendant would have us answer that question "no" because "[t]here was no underlying 'condition' that necessitated [Alfred] to seek[ ] 'treatment' by Dr. Mantell."

As an initial observation, it is difficult to imagine a more essential step in the treatment, cure, or containment of prostate cancer than early detection. Certainly, this record is replete with evidence that confirms this observation. The record also refutes Defendant's claim that Alfred had no "underlying condition" that required "treatment" by Dr. Mantell. Dr. Edward Moss testified that had Dr. Mantell ordered PSA tests from the beginning, an elevated PSA would have been found in 1997 and 1999; that the predictable PSA test results for 1997 and 1999 (had the test been done) would have triggered biopsies of Alfred's prostate; and in his opinion, the biopsies would have disclosed cancer in 1997 and 1999. Thus, there is substantial evidence that Alfred had a "condition" in 1997 and 1999 at the time of his visits with Dr. Mantell. The "condition" was prostate

cancer. The "treatment" was the screening examination performed by Dr. Mantell.

The fact that Alfred did not know he had the "condition" when he sought treatment from Dr. Mantell is not fatal to the trial court's ruling on the continuing care exception. In *Montgomery v. South County Radiologists, Inc.*, 49 S.W.3d 191, 194 (Mo. banc 2001), the plaintiff suffered from chronic back pain. He went to the defendant radiology group for an x-ray and magnetic resonance imaging (MRI) of his spine. One of the defendant's radiologists, Dr. Szoko, reviewed the films February 24, 1995, but found no cancerous tumor on his spine. Other radiologists employed by defendant separately interpreted plaintiff's MRI July 31, 1995, and November 3, 1995 without finding the tumor. Later, another radiologist (not employed by the defendant) read plaintiff's films as showing a cancerous tumor. Plaintiff sued Dr. Szoko, the defendant, and other physicians employed by defendant who read the plaintiff's films. On appeal from a summary judgment favorable to all defendants, the *Montgomery* court affirmed the judgment favorable to Dr. Szoko.[4] *Id.* at 195. It reversed, however, as to the corporate defendant, holding that the health care entity remained liable for the negligence of Dr. Szoko for his acts of February 12, 1995, based on the "continuing care exception." *Id.*

Thus, the *Montgomery* court put its stamp of approval on the continuing care exception even though Montgomery was not being "treated" on February 24, July 31, and November 3 for a condition or complication caused by physicians employed by the defendant and even though Montgomery did not know he had a can-

---

**4.** The court reasoned that "where a physician commits an act of neglect on one specific date, and has no other contact with the pa-

tient, the statute of limitations begins to run on that date." *Id.* at 194[8].

cerous tumor. Moreover, the fact that Montgomery's "treatments" were x-rays and MRI, i.e., examinations to aid in making a diagnosis, did not deter the Supreme Court of Missouri from finding it was treatment "necessary for recovery of any condition."

The *Montgomery* case is strong support for our view that the "continuing care" exception was properly applied here.[5] We find that the "continuing care" exception to the time limitation statute as envisioned by the *Thatcher* and *Montgomery* courts was properly applied here. The "treatment" was periodic, continuing prostate examination; it was treatment of such a nature as to charge Defendant with the duty of continuing care; and it was treatment that was "essential to recovery." Consequently, the trial court did not err when it let the jury hear the evidence about Alfred's visits with Dr. Mantell in 1997 and 1999 and be instructed thereon. Defendant's point is denied. The judgment is affirmed.

GARRISON, J., Concurs in Separate Opinion.

BATES, C.J., Concurs.

PHILLIP R. GARRISON, Judge, concurring.

I concur with the opinion authored by Judge Shrum, but write separately to emphasize that Alfred reported instances of "nocturia" to Dr. Mantell not only on his first visit on December 8, 1997, but also on the subsequent visits of January 27, 1999, and October 20, 2000. In my view, this brings this case even more in line with

---

**5.** We do not ignore Defendant's attempt to distinguish the *Montgomery* case by saying the plaintiff there had "an underlying condition—back pain—for which he continued to seek treatment," whereas here Alfred did not go to Dr. Mantel December 8, 1997, or January 27, 1999, for "treatment" of a "condition" that was "essential to recovery." We find that is a

---

*Montgomery v. South County Radiologists, Inc.,* 49 S.W.3d 191 (Mo. banc 2001).

distinction without a difference, for reasons already given. Alfred had an underlying condition—prostate cancer—for which he was seeking an early diagnosis so it could be successfully treated. The *Montgomery* case teaches that the fact Alfred did not know he had cancer is irrelevant. *See also Reynolds,* 981 S.W.2d at 643.