

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

PAUL B. TIEMANN and )
DEBORAH TANNER (TIEMANN), )
      Appellants, )
    )
v. )  **WD83998**
    )
SSM REGIONAL HEALTH )  FILED: August 24, 2021
SERVICES and THOMAS V. )
DISTEFANO, M.D., )
      Respondents. )

**Appeal from the Circuit Court of Holt County**
**The Honorable Patrick K. Robb, Judge**

**Before Division One: Alok Ahuja, P.J., and**
**Lisa White Hardwick and Anthony Rex Gabbert, JJ.**

Paul Tiemann and his wife Deborah Tiemann sued Dr. Thomas V. DiStefano, and Dr. DiStefano's employer, SSM Regional Health Services, claiming medical malpractice in connection with hip replacement surgeries on Paul Tiemann's right and left hips. SSM and Dr. DiStefano filed motions for summary judgment, alleging that the Tiemanns' claims were barred by the applicable two-year statute of limitations. The circuit court granted summary judgment to both defendants. The Tiemanns appeal. They argue that there were genuine issues of material fact whether the "continuing care" exception operated to delay the running of the statute of limitations. We affirm the circuit court's grant of summary judgment with respect to the Tiemanns' claims concerning Paul Tiemann's right hip replacement surgery (which occurred in 2014), but reverse the grant of summary judgment concerning his left hip surgery (performed in 2016).

## Factual Background

On April 18, 2019, Paul Tiemann and his wife, Deborah Tiemann, filed suit against Dr. DiStefano and SSM in the Circuit Court of Nodaway County.[1]  A change of venue was granted, and the case was transferred to Holt County on June 14, 2019.

The Tiemanns raised three claims in their petition.  In Count I, Tiemann asserted a claim of medical malpractice against Dr. DiStefano, and against SSM under the doctrine of vicarious liability.  Tiemann alleged that Dr. DiStefano negligently performed total hip arthroplasties (or joint replacement surgeries) on Tiemann's hips on August 18, 2014 (right hip), and June 20, 2016 (left hip). Tiemann alleged that Dr. DiStefano negligently positioned the acetabular components during both his right and left hip surgeries, and failed to discover the malpositioning of the acetabular components following the surgeries.  Tiemann alleged that, as a result of the improper positioning of the acetabular components in both prosthetic hips, he experienced pain, numbness, swelling, tenderness, popping, clicking, and instability.  The petition alleged that, as a result of Dr. DiStefano's negligence, Tiemann ultimately underwent total hip revision surgeries on both hips in 2018 at the University of Kansas Medical Center in Kansas City, Kansas.

In Count II, Tiemann alleged that SSM was negligent in retaining Dr. DiStefano on staff and allowing him surgical privileges, despite his demonstrated lack of competence.  In Count III, Deborah Tiemann asserted that Dr. DiStefano's negligence, and her husband's consequent injuries, resulted in a loss of consortium.

---

[1]    We refer to Paul Tiemann as "Tiemann" in this opinion, and use Deborah Tiemann's full name to refer to her.

The Tiemanns' Brief states that the couple is now divorced, and that Deborah Tiemann is now known as Deborah Tanner.  To remain consistent with the nomenclature used in the circuit court, we continue to refer to Tiemann's wife as Deborah Tiemann.

On May 15, 2020, SSM and Dr. DiStefano filed motions for summary judgment on all three of the Tiemanns' claims, asserting that they were barred by the two-year statute of limitations found in § 516.105.[2]

In their response to the summary judgment motions, the Tiemanns argued that, although both of Tiemann's hip replacement surgeries occurred more than two years prior to the filing of their petition, the "continuing care" doctrine applied to delay the accrual of their causes of action.

To support their opposition to the defendants' summary judgment motions, the Tiemanns provided new affidavits by Tiemann and by the Tiemanns' expert, Dr. Michael B. Tilley. Tiemann's affidavit sought to clarify or supplement the testimony he had given in his deposition. Dr. Tilley's affidavit offered new expert opinions, beyond those to which he had testified in his deposition. In his deposition, Dr. Tilley had testified that he had no opinions concerning the quality of Dr. DiStefano's post-operative care of Tiemann, because he had not been provided, or reviewed, the records of that post-operative care. In his summary-judgment affidavit, however, Dr. Tilley now opined that Dr. DiStefano's post-operative care "fell below the accepted standard" either in failing to order surveillance x-rays of Tiemann's hips, or in failing to properly assess those x-rays and discover the misalignment of the prosthetic hips' components.

The defendants moved to strike the affidavits of both Tiemann and Dr. Tilley, arguing that each affidavit contradicted the affiant's prior deposition testimony, and that the affidavits had been "offered for the sole purpose of manufacturing disputes of fact to defeat summary judgment."

The circuit court granted the defendants' motion to strike the Tiemann and Dr. Tilley affidavits. The circuit court also granted the defendants' summary

[2] Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated through the 2020 Cumulative Supplement.

3

judgment motions as to all of the Tiemanns' claims, finding that they were barred

by the two-year statute of limitations.

The Tiemanns appeal. We describe additional facts relevant to the

application of the statute of limitations in the Discussion which follows.

**Standard of Review**

> The trial court makes its decision to grant summary judgment
> based on the pleadings, record submitted, and the law; therefore, this
> Court need not defer to the trial court's determination and reviews the
> grant of summary judgment *de novo*. In reviewing the decision to
> grant summary judgment, this Court applies the same criteria as the
> trial court in determining whether summary judgment was proper.
> Summary judgment is only proper if the moving party establishes that
> there is no genuine issue as to the material facts and that the movant
> is entitled to judgment as a matter of law. The facts contained in
> affidavits or otherwise in support of a party's motion are accepted as
> true unless contradicted by the non-moving party's response to the
> summary judgment motion. . . .
>
> . . . .
>
> The record below is reviewed in the light most favorable to the
> party against whom summary judgment was entered, and that party is
> entitled to the benefit of all reasonable inferences from the record.

*Green v. Fotoohighiam*, 606 S.W.3d 113, 115-16 (Mo. 2020) (quoting *Goerlitz v. City*

*of Maryville*, 333 S.W.3d 450, 452-53 (Mo. 2011)); *see ITT Commercial Fin. Corp. v.*

*Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. 1993).

**Discussion**

**I.**

The Tiemanns argue that their claims were not time-barred, because

Tiemann was receiving "continuing care" related to both his right and left hip-

replacement surgeries within two years of filing this lawsuit on April 18, 2019. We

agree with the Tiemanns' argument with respect to the surgery on Tiemann's *left*

hip. We conclude, however, that any continuing care concerning Tiemann's *right-*

4

hip replacement ended no later than May 26, 2015 – well outside the two-year limitations period.

## A.

The statute of limitations for claims of medical malpractice is set out in § 516.105.1, which provides that "[a]ll actions against physicians . . . for damages for malpractice, negligence, error or mistake related to health care shall be brought within two years from the date of occurrence of the act of neglect complained of[.]" The statute provides three explicit exceptions:  (1) in cases involving the placement of a foreign object in a patient's body; (2) in cases involving the failure to inform a patient of the results of medical tests; and (3) in cases involving a minor patient. § 516.105.1(1), (2) & (3).  With respect to the first two exceptions, the statute specifies that the limitations period begins to run on the date on which the patient discovers the alleged negligence, or "the date on which the patient in the exercise of ordinary care should have discovered" the alleged negligence, whichever is earlier. § 516.105.1(1) & (2).  With respect to the third exception, the statute specifies that a minor shall have until his or her twentieth birthday in which to file suit. § 516.105.1(3).

There is also a fourth, non-statutory exception to the operation of § 516.105.1, referred to as the "continuing care" exception.  This exception was first recognized by the Missouri Supreme Court in *Thatcher v. De Tar*, 173 S.W.2d 760 (Mo. 1943). *Thatcher* held that where treatment for the consequences of an act of medical negligence "'is continuing and of such nature as to charge the medical man with the duty of continuing care and treatment which is essential to recovery,'" then "'the statute does not commence running until the treatment by the physician or surgeon has terminated.'"  *Id.* at 762 (citations omitted); *see Montgomery v. S. Cty. Radiologists, Inc.*, 49 S.W.3d 191, 194 (Mo. 2001) (recognizing the "continuing care exception to the statute of limitations" established in *Thatcher*).  "The duty to

5

attend the patient continues so long as required unless the physician-patient relationship is ended by . . . the cessation of the necessity that gave rise to the relationship." *Weiss v. Rojanasathit*, 975 S.W.2d 113, 119–20 (Mo. 1998).[3]

The Missouri Supreme Court recently applied the "continuing care" exception in *Newton v. Mercy Clinic East Communities*, 596 S.W.3d 625 (Mo. 2020). *Newton* explained that the purpose of the "continuing care" exception "is to ensure that a patient – facing the short statute of limitations imposed by statute – is not faced with the impossible choice of either disturbing a course of treatment by initiating suit against a caregiver or losing a viable cause of action." *Id.* at 627.

In *Newton*, a physician surgically removed a patient's ovarian cyst on July 10, 2012. The physician continued to see the patient, including for treatment of a surgical-site infection which required hospitalization, through an appointment on February 5, 2013. *Id.* at 626. The patient saw another physician in the same hospital for further post-operative care on June 18, 2013. *Id.* "After the appointment on February 5, 2013, [the patient] did not see [the defendant-physician] again until January 29, 2015, when [the patient] presented for a general gynecological exam." *Id.* During that January 2015 examination, the patient complained of fertility problems. *Id.* It was ultimately determined that the patient's fertility issues were caused by damage to her fallopian tubes, which allegedly resulted from the infection following the cyst-removal procedure. *Id.* The patient and her husband filed suit against the physician on June 1, 2016. *Id.*

---

[3] "Continuing care" may terminate in three other ways: (1) by the mutual consent of the parties; (2) by the physician's withdrawal from the relationship after reasonable notice to the patient; and (3) by the patient's dismissal of the physician. *Weiss*, 975 S.W.2d at 119-20. None of these circumstances exist here.

The Supreme Court held that the patient's lawsuit was time-barred, because it was filed more than two years after any "continuing care" relating to the surgical-site infection had ceased in June 2013. The Court explained that

> [t]he necessity that gave rise to [the physician]'s duty of continuing care to [the patient] was the surgical removal of an ovarian cyst and related post-operative care, including treatment of the surgical site infection. Both parties agree that the last date on which [the physician] treated that infection was February 5, 2013, and that the infection itself ended (at the latest) June 18, 2013.

*Id.* at 629 (footnote omitted).

The Court rejected the patient's argument that the statute of limitations did not begin to run in 2013, because the physician knew or should have known that the patient required further medical treatment. Instead, the Court explained that "the date on which the necessity that gave rise to the duty ended[ ] is to be determined using an objective standard without inquiry into what the physician knew or should have known." *Id.* at 628.

*Newton* also rejected the patient's contention that she was receiving "continuing care" in 2015, because she complained of, and sought further treatment for, consequences which flowed from the physician's earlier negligence.

> The two-year statute of limitations set forth in section 516.105 requires all actions to be brought within two years of the date of the alleged negligence, irrespective of when the damage is discovered. *See Weiss*, 975 S.W.2d at 121. This Court has held "continuing or subsequently developing damages or injuries do not start the running of section 516.105 anew," and the statute of limitations commences to run upon the occurrence of the act of neglect, not upon the ascertainment of the damage resulting from the wrong. *Id.* at 119.
>
> If treatment for consequences resulting from medical negligence were part of the doctor's duty of continuing care and served to toll the statute of limitations for so long as necessary to treat such consequences, then the continuing care tolling doctrine would simply be another name for the discredited discovery doctrine because the patient would not return for such treatment unless and until he or she discovered there were consequences necessitating treatment. The

7

Court declines to stretch the continuing care tolling doctrine to that extent.

*Id.* at 629.

### B.

Dr. DiStefano and SSM argue that the "continuing care" exception should not apply here for multiple reasons, each of which is unpersuasive.

The defendants first argue that the "continuing care" exception does not apply to single acts of surgical negligence, such as Dr. DiStefano's alleged misalignment of the components of Tiemann's prosthetic hips during the arthroplasty procedures. But the defendants cite to no Missouri case which prohibits the application of the doctrine to negligent acts committed during surgery. In *Newton*, the Missouri Supreme Court explained that the "continuing care" exception is intended to prevent a patient from being forced to discontinue an ongoing "course of treatment" by filing suit precipitously, due to the time pressure imposed by the statute of limitations. *Id.* at 627. The defendants offer no persuasive argument why the "course of treatment" a patient receives in connection with a hip-replacement surgery should consist only of the surgery itself, but not the post-operative care that is contemplated by physician and patient before the surgery is ever performed, and that is essential for the patient to receive the full benefit of the arthroplasty procedure. Notably, in *Montgomery v. South County Radiologists, Inc.*, 49 S.W.3d 191 (Mo. 2001), the Missouri Supreme Court held that the "continuing care" exception was inapplicable "[w]here a physician commits an act of neglect on one specific date, *and has no other contact with the patient.*" *Id.* at 194 (emphasis added). Unlike in *Montgomery*, Dr. DiStefano <u>did</u> have "other contact" with Tiemann after performing the arthroplasty surgeries, as both parties fully contemplated from the outset. The "continuing care" exception can properly be applied to surgical-negligence claims like the ones the Tiemanns make in this case.

8

The defendants also argue that the "continuing care" exception can only be applied where the plaintiff alleges that the ongoing care was *itself* negligent. As discussed more fully in § II, below, the Tiemanns have no competent evidence that Dr. DiStefano was negligent in the post-operative care he provided to Tiemann. Accordingly, the defendants contend that the "continuing care" exception cannot apply here. The defendants' argument is once again disproven by *Newton*. In *Newton*, the plaintiffs alleged that a female patient was rendered infertile due to a surgical-site infection which was caused by negligent acts of the physician-defendant between July 16, 2012, and August 1, 2012, during the patient's immediate post-operative care. 596 S.W.3d at 626. Despite the fact that the negligence which allegedly caused the infection ended on August 1, 2012, the Supreme Court held that "continuing care" was occurring until "the treatment for cyst removal and resulting surgical site infection ended, i.e., June 18, 2013, at the latest." *Id.* at 629. Thus, *Newton* held that the "continuing care" which prevented the statute of limitations from running could continue <u>after</u> the defendant's alleged negligence had ended. The defendants' argument is inconsistent with *Newton*, and we accordingly reject it.

The defendants also argue that the "continuing care" exception cannot be applied to a hospital, and that it does not apply to claims of vicarious or derivative liability (like Deborah Tiemann's loss of consortium claim, or the vicarious liability claim asserted against SSM as Dr. DiStefano's employer). In *Montgomery*, 49 S.W.3d 191, the Missouri Supreme Court rejected an argument by a corporate multi-physician radiology clinic that the "continuing care" exception only applies to claims against an individual treating physician:

> SCR strenuously argues that its services – even if continuing – are not of such a nature as to charge it with a duty of continuing care and treatment. SCR believes that only the treating physician can have such a duty, while other health-care entities cannot, citing dicta in

9

> *Shah v. Lehman*, 953 S.W.2d 955, 958 (Mo. App. 1997), and *Dunagan v. Shalom Geriatric Center*, 967 S.W.2d 285, 289 (Mo. App. 1998). Neither *Shah* nor *Dunagan* holds that health-care entities cannot have a duty of continuing care, but rather, both found no duty on the facts in those cases. By invoking section 516.105, SCR concedes that it is an "entity providing health care services." The plain language of section 516.105 does not distinguish between types of providers, but covers any "entity providing health care services."
>
> SCR ignores that the treating physician must rely on specialists, such as radiological services: "the doctor must render [continuing care and treatment] or must see to it that some other competent person does so until termination of the physician-patient relationship." *Weiss*, 975 S.W.2d at 120 . . . . The treating physician, thus, has a comprehensive duty of continuing care and treatment. Likewise, an entity that provides continuing radiological services has a proportionate duty of continuing care until its relation with the patient ends.

49 S.W.3d at 195 (emphasis and other citations omitted); *accord*, *Cole v. Ferrell-Duncan Clinic*, 185 S.W.3d 740, 742-45 (Mo. App. S.D. 2006) (applying "continuing care" exception to claims of medical negligence and loss of consortium filed against "a health care entity that . . . employed about 100 physicians"). The fact that SSM is a hospital, rather than an individual treating physician, does not prevent application of the "continuing care" exception.

We also reject the defendants' contention that the "continuing care" exception cannot be applied to claims of vicarious or derivative liability. Claims asserting vicarious liability against an employer, and claims for loss of consortium by a spouse, are both derivative of the patient's underlying negligence claim against the physician. Neither a vicarious liability claim, nor a loss of consortium claim, can exist without a viable underlying negligence claim by the injured patient against the treating physician. *See*, *e.g.*, *Dalbey v. Heartland Reg'l Med. Ctr.*, 621 S.W.3d 36, 43 (Mo. App. W.D. 2021) ("'where the right to recover is dependent entirely on the doctrine of respondeat superior and there is a finding of no negligence by the servant there should be no judgment against the master'" (citations omitted));

10

*Kamerick v. Dorman*, 907 S.W.2d 264, 267 (Mo. App. W.D. 1995) ("A consortium claim is derivative from the injured spouse's claim and depends on the validity of the underlying claim. Although the consortium claim and the underlying claim exist to compensate the two spouses for the different losses they sustain, both involve a claim for damages for malpractice or negligence related to health care. Thus, both are governed by § 516.105." (citations omitted)).

Both a vicarious liability claim and a loss of consortium claim are subject to the same statute of limitations as Tiemann's claim against Dr. DiStefano, and should be subject to the same "continuing care" exception. Refusing to apply the "continuing care" exception to either a vicarious liability claim, or to Deborah Tiemann's loss of consortium claim, would create the very dilemma which the Missouri Supreme Court has sought to avoid by adoption of the doctrine: "that a patient – facing the short statute of limitations imposed by statute – is not faced with the impossible choice of either disturbing a course of treatment by initiating suit against a caregiver or losing a viable cause of action." *Newton*, 596 S.W.3d at 627. Such disruption of ongoing care would occur by the early assertion of a vicarious liability or loss of consortium claim, as much as by a direct negligence claim against the individual treating physician. Although neither opinion specifically discusses the issue, we note that in both *Montgomery* and *Cole*, the courts applied the "continuing care" doctrine both with respect to a patient's direct negligence claims, but also with respect to a spouse's loss of consortium claim. *See Montgomery*, 49 S.W.3d at 192 (noting that suit involved claims for both "medical negligence and loss of consortium"); *Cole*, 185 S.W.3d at 741 (same).

## C.

We analyze the statute of limitations separately with respect to the arthroplasties performed on Tiemann's right and left hips. Although Dr. DiStefano performed similar hip-replacement procedures on both of Tiemann's hips, the

11

surgeries were performed almost two years apart, and addressed distinct medical issues. During the summary judgment briefing, the Tiemanns admitted that "[d]egenerative joint disease in the right hip is a different condition than degenerative joint disease in the left hip," that "the treatment for degenerative joint disease in one hip is separate and distinct from treatment of degenerative joint disease in the other hip," and that "[t]reating degenerative joint disease in the right hip [will not] cure degenerative joint disease in the left hip, and vice versa." Because the treatment for Tiemann's two hips was "separate and distinct," we must separately consider whether the Tiemanns' claims concerning the right- and left-hip surgeries are time-barred.

**1.**

With respect to Tiemann's right hip, the undisputed facts establish that Tiemann's post-operative care terminated no later than May 26, 2015 – well more than two years before the Tiemanns filed suit on April 18, 2019.

Dr. DiStefano performed a total arthroplasty on Tiemann's right hip at SSM Health St. Francis Hospital – Maryville on August 18, 2014. Tiemann was seen two weeks after his discharge from the hospital, on September 2, 2014, to have his staples removed by a nurse. Tiemann reported that he was "doing well." He was given a refill of his prescription for hydrocodone, a painkiller.

Tiemann saw Dr. DiStefano for the first post-operative evaluation of his right hip on September 30, 2014, six weeks after his surgery. Tiemann reported that he had no pain or issues with his right hip at that time. X-rays were taken of Tiemann's right hip, and they were interpreted as demonstrating "very good alignment." Dr. DiStefano prescribed Tiemann Hydrocodone and instructed him to apply ice to his hip three times a day. Tiemann was released to resume light duty and activities.

12

Tiemann's second post-operative evaluation took place six weeks later on November 11, 2014. More x-rays were taken, which again showed "good alignment with no change" from the last visit. Dr. DiStefano instructed Tiemann to continue taking Mobic, a nonsteroidal anti-inflammatory drug that relieves pain, as well as continue to ice his hip three times a day. Dr. DiStefano released Tiemann to return to regular duty and activities, including work, with no restrictions.

On December 9, 2014, Tiemann saw an SSM nurse again, with his chief complaint being right hip pain. Tiemann reported feeling a catch in his hip while walking or when getting up from a low chair, and rated his pain, on a scale of one to ten, at a six or seven.

Tiemann next saw Dr. DiStefano regarding his right hip on May 26, 2015, at which time he reported that the right hip was "good" and "doing well." Another set of x-rays were taken, and they demonstrated the right hip was in "good alignment."

In the Statement of Undisputed Material Facts supporting their summary judgment motion, the defendants asserted that the May 26, 2015 visit was when Tiemann "last saw Dr. DiStefano regarding the right hip." The defendants supported this statement with the records of the May 26, 2015 visit, and with Tiemann's deposition.[4] In his deposition, Tiemann agreed that, during his visit with Dr. DiStefano on May 26, 2015, "there was a report of no pain and generally that the hip was doing good." Tiemann testified that, following the May 26, 2015 visit, he was instructed by Dr. DiStefano to follow up with respect to his right hip as

---

[4] Tiemann argues that the defendants failed to make a *prima facie* case for summary judgment, because according to Tiemann the defendants had the burden to negate the "continuing care" exception in their summary judgment motion, and failed to do so. We need not decide who had the burden to prove the applicability (or inapplicability) of the "continuing care" exception. Even if the burden was on the defendants as the moving parties, their summary judgment motion negated the applicability of the "continuing care" exception as to Tiemann's right-hip arthroplasty by explicitly alleging – with competent evidentiary support – that Tiemann "last saw Dr. DiStefano regarding the right hip" on May 26, 2015.

13

needed, but that he had no further medical care for his right hip until he dislocated the hip in July 2018 (more than three years later):

> Q.     But generally in May of 2015, things were good with your right hip?
>
> A.     Yes.
>
> Q.     And you were instructed to follow up as needed?
>
> A.     Uh-huh.
>
> . . . .
>
> Q.     . . . After the visit in May of 2015, did you ever return to St. Francis for your right hip other than coming back in July of 2018 when you went to the emergency room because there was an issue with twisting and a toolbox?
>
> . . . .
>
> A.     No, I only went there just for standard visits.
>
> Q.     What do you mean "standard visits"?
>
> A.     Well, the scheduled visits that I had, and that was probably about it.
>
> Q.     Did you have any – if the instructions in May of 2015 were to follow up as needed –
>
> A.     Yes.
>
> Q.     – did you have any scheduled visits after 2015 for your right hip?
>
> A.     No.  I think it was – we stopped at a year, visits for the right hip.

In their opposition to the defendants' summary judgment motion, the Tiemanns sought to deny that the May 26, 2015 visit was the last time Dr. DiStefano saw Tiemann concerning his right hip.  But the evidentiary materials on which they relied did not support their denial.  First, the Tiemanns relied on medical records of Tiemann's visits to Dr. DiStefano on February 21, 2017, and on May 16, 2017.  But the records of those visits (which occurred following Tiemann's _left_-hip surgery) both indicate that the reason for the visits was to "follow-up [on]

14

left hip pain." There is no mention in the records that Tiemann complained of pain or other problems with his _right_ hip during those visits. While Dr. DiStefano may have examined both of Tiemann's hips, there is no indication that the visits constituted continuing post-operative care for any complication resulting from Tiemann's right-hip arthroplasty procedure.

The Tiemanns' denial also relied on a passage from Tiemann's deposition, in which he testified that "I'm thinking there was" a further visit concerning his right hip following the May 26, 2015 appointment. Tiemann testified that "I went back for my right [hip] for a checkup because I was concerned" following the May 26, 2015 visit. When asked when that visit occurred, Tiemann could not specify; in particular, he could not recall whether that further checkup occurred before or after he was seen by Dr. DiStefano for an unrelated orthopedic issue involving his right hand in August 2015. No medical records substantiate the further visit which Tiemann vaguely recalled. Given that Tiemann could not even recall if this purported visit occurred before or after August 2015 – almost _four years_ before this lawsuit was filed – Tiemann's testimony that _some_ further visit occurred concerning his right hip, at an unspecified time, cannot create a genuine issue of material fact that he was receiving "continuing care" concerning his right hip on or after April 18, 2017.

Finally, in denying the defendants' claim that Tiemann's last treatment for his right hip occurred on May 26, 2015, the Tiemanns relied on Tiemann's summary-judgment affidavit. In that affidavit, Tiemann claimed that he informed Dr. DiStefano and his staff, "at every visit between August 18, 2014, and July 2, 2018," that he was experiencing "popping, clicking and catching" in his right hip. To the extent Tiemann's affidavit claims that he made complaints concerning his right hip during the May 26, 2015 visit, his affidavit contradicts his deposition testimony, in which he testified that he had no complaints of pain during that visit,

15

and that his right hip was "doing good." Further, Tiemann testified that, during his August 2015 visit for his right _hand_ injury, he likewise reported that he was "happy with [his] right hip at that point in time." In his deposition, Tiemann also testified that, in the year prior to visiting the emergency room concerning his right hip in July 2018, he had not "had any issues with [his] right hip."

In light of his deposition testimony, the circuit court could properly disregard the claim in Tiemann's affidavit that he made complaints concerning his right hip "at every visit between August 18, 2014, and July 2, 2018." "[A] party may not avoid summary judgment by giving inconsistent testimony and then offering the inconsistencies into the record in order to demonstrate a genuine issue of material fact." *ITT Commercial*, 854 S.W.2d at 388; *accord*, *Kellog v. Kellog*, 989 S.W.2d 681, 687 (Mo. App. E.D. 1999) (no genuine factual issue was created by plaintiff's summary judgment affidavit concerning his mental incapacity, which contradicted his deposition testimony); *Rustco Prods. Co. v. Food Corn, Inc.*, 925 S.W.2d 917, 923 (Mo. App. W.D. 1996) ("[c]ompetent material evidencing two plausible, but contradictory, conclusions cannot come from the testimony of the same witness" to preclude grant of summary judgment).

But even if Tiemann's summary-judgment affidavit were properly considered, it would not create a genuine factual dispute as to whether he was receiving "continuing care" for his right hip replacement from the performance of the surgery in August 2014, through the commencement of the limitations period in April 2017. As *Newton* makes clear, "continuing care" only exists if a patient is actually receiving continuing treatment from the health-care provider for the condition on which the claim of negligence is based. *Newton* specifies that "continuing care" is not established merely because the patient later requires treatment for complications arising from the health-care provider's negligence, or because the health-care provider knew, or should have known, of the patient's need for further

16

treatment. 596 S.W.3d at 628-29. Tiemann's claim that he continued to complain of right-hip discomfort cannot alone establish "continuing care," without some evidence that Dr. DiStefano was actually *treating him* for that discomfort on an ongoing basis. *See Kamerick v. Dorman*, 907 S.W.2d 264, 266 (Mo. App. W.D. 1995) (phone call by patient to physician's office, complaining of doctor's diagnosis, "does not rise to the level of medical care, services or treatment").

We accordingly conclude that the Tiemanns' claims relating to the arthroplasty performed on Paul Tiemann's right hip on August 18, 2014, are time-barred, and that the circuit court properly granted summary judgment with respect to those claims.

**2.**

We reach a different conclusion concerning the timeliness of the Tiemanns' claims concerning the surgery on Tiemann's <u>left</u> hip.

On June 20, 2016, Dr. DiStefano performed an arthroplasty on Tiemann's left hip at SSM in Maryville. Tiemann returned two weeks after discharge, on July 5, 2016, to have a nurse remove his staples. The nurse's report of the visit noted that Tiemann was positive for joint and muscle pain.

Tiemann returned to Dr. DiStefano's practice on July 19, 2016, and reported to a nurse that he was experiencing an increased pain level of 3 out of 10 in his left hip, which began on July 14, 2016. The nurse noted mild swelling in the posterior of Tiemann's left hip and reported it was mildly tender. The nurse instructed Tiemann to continue taking Mobic for pain and icing his hip.

Tiemann saw Dr. DiStefano on July 26, 2016. Although Dr. DiStefano's notes of the visit state that Tiemann had "no pain, no issues," he also recorded that Tiemann was experiencing "some stiffness," and was taking Mobic for pain. Dr. DiStefano's notes reflect that his "treatment plan" was for Tiemann to continue

17

taking Mobic, ice his hip three times a day, exercise his hip twice per day, and "[f]ollowup in 6 weeks with an x-ray."

On August 1, 2016, following Tiemann's request at the prior visit, Dr. DiStefano released Tiemann to return to work without restrictions.

On August 30, 2016, Tiemann returned to see Dr. DiStefano, with the chief complaint of left hip pain. Tiemann reported it felt like parts were moving around in his hip and that he was having some popping. He also reported a dull or aching pain, as well as locking and catching. The duration was noted as "constant," and the frequency as once a week/intermittent. The symptoms were aggravated by bending, squatting, and walking, and were limiting Tiemann's activities. Dr. DiStefano instructed Tiemann to continue taking Mobic and icing his hip three times a day, as well as to exercise daily on an elliptical, starting at eight minutes per day and increasing to thirty minutes per day, four times a week.

Dr. DiStefano saw Tiemann for a follow-up visit on October 25, 2016. The chief complaint for the visit was noted as hip pain. Dr. DiStefano's records indicate that Tiemann was positive for pain in the left hip. Tiemann also reported numbness in the skin nerves around his left hip. Due to Tiemann's complaints of numbness, Dr. DiStefano ordered an electromyography to test the nerves in that area. Tiemann was later told the results came back as "all right" or "normal." At that visit, Tiemann reported that he was doing better and had started running again, but also that his hip was popping at times. Dr. DiStefano instructed Tiemann to continue exercising daily and to return in three months for another x-ray.

On February 21, 2017, Tiemann saw Dr. DiStefano again for a "followup" visit for "left hip pain." Dr. DiStefano's notes indicate that Tiemann was also having "some numbness in the leg." Although Dr. DiStefano's notes indicate that Tiemann reported "[n]o pain," his notes also indicate that Tiemann was continuing

18

to take Mobic. Dr. DiStefano instructed Tiemann to follow up in six months, one-year from his left-hip arthroplasty.

On May 4, 2017, Tiemann fell in the bathtub, causing left hip pain. On May 16, 2017, before his six-month follow-up after the February 21, 2017 visit, Tiemann returned to Dr. DiStefano for an evaluation of his left hip pain. Dr. DiStefano noted in his records that Tiemann reported no pain in his left hip prior to his fall. More x-rays were taken, which were interpreted to show no evidence of hardware failure. Dr. DiStefano instructed Tiemann to apply ice to the left hip and follow-up as needed.

Tiemann returned to Dr. DiStefano's practice, and saw a nurse-practitioner, on June 30, 2017, complaining of left hip pain. Tiemann returned once again on November 29, 2017, reporting three weeks of pain in his left hip, which he rated a 5 out of 10. The pain was aggravated by walking and standing, and limited his activities. The nurse-practitioner also noted pain upon direct pressure. Tiemann was given a corticosteroid shot and instructed to take 600mg of ibuprofen three times a day for two weeks. Tiemann saw the nurse-practitioner again for pain in his left hip on March 15, 2018.

Given this course of treatment, the Tiemanns presented a genuine issue of material fact whether Tiemann was receiving "continuing care" associated with his left-hip replacement surgery, from the time of that surgery on June 20, 2016, into the limitations period commencing on April 18, 2017. Dr. DiStefano's records indicate that Tiemann was following up with Dr. DiStefano because of complaints of pain in his left hip, and that Dr. DiStefano was offering Tiemann treatment for his complaints of pain (including taking x-rays, and recommending medication, icing, exercise and further follow-up visits). While it may not be entirely clear whether that course of post-operative treatment was continuing following the February 21, 2017 visit, where Tiemann apparently reported that he was experiencing "no pain,"

19

the fact that a further follow-up visit was scheduled, and that Tiemann continued to take pain medication, could support the conclusion that Dr. DiStefano continued to provide Tiemann with post-operative care for complications of his left-hip replacement surgery (including pain and numbness). A jury could reasonably find that Dr. DiStefano's instructions for Tiemann to return in six months for further examination of his left hip demonstrated that Dr. DiStefano recognized that Tiemann needed ongoing therapy for his pain, in order to achieve full recovery from his left-hip arthroplasty. A jury could find that this follow-up visit was intended not merely as general surveillance, but instead as "continuing care" to treat (and hopefully resolve) Tiemann's lingering left hip pain.

Thus, a genuine issue of material fact exists as to whether "the necessity that gave rise to the relationship" continued to exist following the February 21, 2017 visit. *See Weiss*, 975 S.W.2d at 119–20. The defendants failed to establish that they were entitled to summary judgment on the Tiemanns' claims related to Tiemann's left-hip arthroplasty, based on the application of the two-year statute of limitations found in § 516.105.

## II.

In their third Point, the Tiemanns argue that the circuit court erred in striking the summary-judgment affidavit of Dr. Michael Tilley, the orthopedic surgeon who performed Tiemann's total hip revision surgeries in 2018. In his affidavit, Dr. Tilley opined that Dr. DiStefano had been negligent in his post-operative care of Tiemann. Specifically, in his affidavit Dr. Tilley opined that Dr. DiStefano's post-operative care of Tiemann had fallen below the standard of care

> if he failed to continue his care of Paul Tiemann by ordering and reviewing the appropriate x-rays after each total hip replacement at [specified] intervals; and that even if Dr. DiStefano did engage in such follow-up x-ray protocol, that his care . . . still fell below the accepted standard because he continuously failed to detect and remedy the grossly obvious, misaligned manner in which he had originally

20

installed the integral component parts of both the left and right total hip replacements.

Dr. Tilley's affidavit was properly stricken, because it was inconsistent with his deposition testimony. In his deposition, Dr. Tilley stated he would not be providing an opinion on the post-operative care provided to Tiemann. Dr. Tilley testified that he had not been provided with any records concerning the post-operative care provided by Dr. DiStefano, and he "ha[d] no idea" if Dr. DiStefano had taken x-rays of Tiemann's hips following his surgeries. Instead, Dr. Tilley testified that his opinions were based entirely on the radiographs taken at the University of Kansas Medical Center in 2018, and what Dr. Tilley saw intraoperatively as he performed Tiemann's 2018 hip revision surgeries. As the Tiemanns themselves acknowledge, "Dr. Tilley indicated in his deposition, repeatedly, that he did not then have any opinion regarding post-operative care by Dr. DiStefano *because he had not seen any of the records*." They repeat this statement in their reply brief: "Dr. Tilley clearly informed Defendants that the reason he did not have an opinion about post-operative care *at the time of his deposition* was because he had not reviewed any of the St. Francis records."

Despite his deposition testimony that he could not offer any opinions concerning Tiemann's post-operative care, because he had not reviewed the records of that care, in his affidavit Dr. Tilley purports to offer opinions concerning Dr. DiStefano's post-operative care – even though it is evident that Dr. Tilley's new standard-of-care opinions are not based on review of Tiemann's post-operative records (since Dr. Tilley's affidavit reflects that he <u>still</u> "has no idea" whether post-operative x-rays were even taken of Tiemann's hips).[5]

---

[5] Dr. Tilley's affidavit <u>does</u> state that he reviewed the record of a May 16, 2017 visit by Tiemann to Dr. DiStefano's practice. But the only conclusion Dr. Tilley derives from that record is that the x-ray which Dr. DiStefano ordered on that date "is the appropriate method of examination when a bilateral hip study is needed and constitutes continuing care[.]"

Having reviewed no additional medical records detailing the post-operative care Dr. DiStefano provided to Tiemann, Dr. Tilley may not provide an opinion which he previously testified he was unable to give, simply as a means to prevent the grant of summary judgment to Dr. DiStefano and SSM. "[A] party may not avoid summary judgment by giving inconsistent testimony and then offering the inconsistencies into the record in order to demonstrate a genuine issue of material fact." *ITT Commercial*, 854 S.W.2d at 371; *see Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498-99 (8th Cir. 2008) (district court did not err in striking physician-expert's summary judgment affidavit, where in his deposition the expert "testified that he had no specific criticisms of the defendants' medical treatment," but in his affidavit "opine[d] that if the defendants had treated Popoalii's intracranial pressure they likely could have prevented her blindness").

Point III is denied.[6]

### Conclusion

We affirm the circuit court's grant of summary judgment to the defendants with respect to the Tiemanns' claims concerning the right-hip arthroplasty performed on Paul Tiemann in August 2014. We reverse the circuit court's grant of summary judgment with respect to the Tiemanns' claims concerning Paul

---

[6]    We find it unnecessary to address any further arguments made by the Tiemanns in Point II, concerning the striking of Tiemann's summary judgment affidavit, or in Point IV, concerning the circuit court's ruling deeming certain facts asserted by the defendants to be admitted. As we have explained in § I.C.1, above, the circuit court properly found that the Tiemanns failed to effectively controvert the critical fact supporting the grant of summary judgment concerning Tiemann's right-hip surgery: that his "last" visit with Dr. DiStefano concerning that hip occurred in May 2015. Whether the Tiemanns effectively controverted <u>other</u> factual contentions made in the defendants' summary judgment motions, including through reliance on Tiemann's summary judgment affidavit, is irrelevant to the timeliness of their claims concerning the right-hip surgery. With respect to the left-hip surgery, we have concluded in § I.C.2, above that summary judgment must be reversed, without reference to any aspects of Tiemann's affidavit, or the trial court's ruling deeming certain facts to be admitted.

Tiemann's left-hip arthroplasty.  The case is remanded to the circuit court for further proceedings consistent with this opinion.

_____
Alok Ahuja, Judge

All concur.