

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| DANE TEMPLETON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | WD85405 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | April 4, 2023 |
| CHARLES ORTH, D.O., and | ) | |
| ORTHOPEDIC SURGEONS, INC., | ) | |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable David P. Chamberlain, Judge**

**Before Division Three:** Thomas N. Chapman, Presiding Judge, and
Mark D. Pfeiffer and Cynthia L. Martin, Judges

Mr. Dane Templeton ("Templeton") appeals from the judgment of the Circuit

Court of Clay County, Missouri ("trial court"), granting Charles Orth, D.O. ("Dr. Orth")

and Orthopedic Surgeons, Inc.'s motion for summary judgment. Templeton argues that

the trial court erred in granting summary judgment and concluding as a matter of law that

his medical malpractice lawsuit was barred by the applicable statute of limitations.

Because the undisputed facts in the summary judgment record[1] demonstrate as a matter

of law that Templeton's medical malpractice lawsuit was time-barred as to treatment

rendered in 2012, but do not demonstrate as a matter of law that Templeton's medical

malpractice lawsuit was time-barred as to treatment rendered in 2015-2016, we affirm in

part and reverse and remand in part.[2]

---

[1] As the Missouri Supreme Court has explained:
[1] Facts come into a summary judgment record only via Rule 74.04(c)'s numbered-paragraphs-and-responses framework.
[2] Courts determine and review summary judgment *based on that Rule 74.04(c) record, not the whole trial court record.*
[3] Affidavits, exhibits, discovery, etc. generally play only a secondary role, and then only as cited to support Rule 74.04(c) numbered paragraphs or responses, *since parties cannot cite or rely on facts outside the Rule 74.04(c) record.*
[4] [S]ummary judgment rarely if ever lies, or can withstand appeal, unless it flows as a matter of law from appropriate Rule 74.04(c) numbered paragraphs and responses alone.

*Green v. Fotoohighiam*, 606 S.W.3d 113, 117-18 (Mo. banc 2020).  Accordingly, on appeal, we have presented the facts as directed by *Green*.

[2] Dr. Orth and Orthopedic Surgeons, Inc. seek dismissal of Templeton's appeal for alleged Rule 84.04(c) briefing deficiencies.  While we agree that Templeton's appellate briefing has not rigidly adhered to the template for claiming trial court error as to a summary judgment ruling, *see Fid. Real Est. Co. v. Norman*, 586 S.W.3d 873, 884-85 (Mo. App. W.D. 2019), our review of the summary judgment record and corresponding statement of facts in Templeton's appellate brief relating to the salient facts of undisputed dates and chart entries of relevant medical treatment between August and October of 2016 necessary to disposition of this appeal are not in dispute and, hence, our ability to address the sole claim presented has not been impeded by any alleged Rule 84 violation, *see Long v. Sterling Real Est. Acquisitions, L.L.C.*, 554 S.W.3d 455, 459 n.3 (Mo. App. W.D. 2018); hence, we deny the request to dismiss the appeal in accord with our "preference to reach the merits of every appeal," *see Fisher v. Slinger*, 634 S.W.3d 704, 707 (Mo. App. W.D. 2021).

**Factual and Procedural Background**[3]

The facts in this case that are material to determining whether the statute of limitations has expired are undisputed. As will be discussed below, Templeton filed his medical malpractice action against Dr. Orth on October 9, 2018. The question presented on appeal is whether Templeton's claims were timely under the two-year statute of limitations found in section 516.105.[4]

On September 16, 2012, when Templeton was almost eighteen years old, he was ejected from the passenger seat of a golf cart into a barbed wire fence and tree, causing him to sustain an injury to his right knee and thigh. He was originally taken to Children's Mercy Hospital. On September 17, 2012, Templeton went to North Kansas City Hospital for initial evaluation and treatment. He was first introduced to Dr. Orth on September 18, 2012. Templeton told Dr. Orth how the golf cart incident happened: "[W]e had told Dr. Orth that we had gone down a hill and there was a fence. There's a fence right there. There was a dead tree laying over the fence with the branches pointing towards the road, and I went right into that dead tree." The ejection from the golf cart left Templeton with "a hole in this leg the size of a nickel."

On September 18, 2012, two days after being ejected from the golf cart, Dr. Orth operated on Templeton's right leg: "Right knee arthroscopy with arthroscopic lavage,

---

[3] "This Court reviews the record in the light most favorable to the party against whom [summary] judgment was entered." *Newton v. Mercy Clinic E. Cmtys.*, 596 S.W.3d 625, 628 (Mo. banc 2020).

[4] All statutory references are to the REVISED STATUTES OF MISSOURI 2016, as supplemented.

irrigation and debridement to patella, 3 x 4 cm, quadriceps tendon repair and medial retinacular tear." Templeton was discharged from North Kansas City Hospital on September 20, 2012.

Templeton returned to Orthopedic Surgeons, Inc. for evaluation and removal of surgical staples on October 4, 2012, and further evaluation and treatment on October 18, 2012, November 8, 2012, and December 6, 2012, at which time Dr. Orth's clinic note stated, "I am releasing [Templeton] from my care. . . ."

Dr. Orth did not provide any medical care or treatment to Templeton between December 6, 2012, and December 10, 2015, when Templeton, then twenty-one years of age, returned to Dr. Orth because of swelling in his right knee. Following a physical examination, Dr. Orth ordered an MRI to further evaluate Templeton's right knee/leg on December 10, 2015. On February 21, 2016, Templeton presented to North Kansas City Hospital, and an MRI was taken of his right leg. A radiology report was completed, and the images/report were provided to Dr. Orth. Following the February 21, 2016 MRI, Templeton returned to Orthopedic Surgeons, Inc. on March 17, 2016. The results of the MRI were shared with Templeton and his mother and a potential right knee arthroscopy was discussed. On March 25, 2016, Dr. Orth performed an arthroscopy on Templeton's right knee with a three-compartment synovectomy, synovial biopsy, and chondroplasty of the patella.

Between March 25, 2016, and May 13, 2016, Templeton returned to Dr. Orth's office, as instructed, for follow-up care and treatment on April 6, 2016, April 14, 2016, April 28, 2016, May 12, 2016, and May 13, 2016. On May 25, 2016, Templeton was

4

admitted to North Kansas City Hospital, and MRI scans of his right knee and thigh were taken. The results of the MRI scans were shared with Templeton and Dr. Orth determined that Templeton would need to undergo another surgery, a right knee arthrotomy, which was scheduled for May 27, 2016.

The day before the scheduled May 27, 2016 surgery, Templeton was seen by a rheumatologist, Dr. Cameron Jones, at Dr. Orth's request. Dr. Jones noted:

> He seems to have significant trauma to the knee and the distal thigh muscles. There is patellar retinacular disease and actually rupture most likely. He has subluxation of the patella. He has a fluid type loculated mass in the distal thigh area. The thought of this being infected has been raised. He does not appear to have any infection of this joint, white cell count is not very high, and his cultures so far of the right knee fluid are negative. The fluid in his right thigh, however, may not be communicating with the knee and there could be second process going on that is not directly in the knee itself. Based on the MRI report he may have areas of two different signs of fluid. . . . The history of trauma and the problems with his knees since then would indicate that this is all related to trauma in some way. . . . Perhaps this should be either aspirated or explored to culture this region and see if there is any source of infection or chronic irritation or other illness affecting his distal thigh region.

Dr. Orth mentioned the rheumatology consult in his May 27, 2016 operative report as follows: "Rheumatology consult was obtained to rule out some autoimmune deficient type problem and did not feel like there was one." Following the May 27, 2016 surgery, Templeton remained hospitalized for sixteen days. During this extended hospitalization, Dr. Orth performed an additional right knee surgery on Templeton on June 5, 2016.

After Templeton was released from the hospital, Templeton continued to be treated by Dr. Orth with follow-up appointments on June 13, 2016; June 14, 2016; July 7, 2016; and August 4, 2016.

5

On August 18, 2016, Templeton returned to Dr. Orth for follow-up care and treatment. In light of an elevated white blood cell count, Dr. Orth prescribed an antibiotic (Bactrim) to be taken prophylactically. On August 22, 2016, Dr. Orth ordered an MRI scan of Templeton's right leg due to "worsening right thigh pain, [and] recent history of infection following knee surgery." The results of the MRI were shared with Templeton and his mother during an appointment with Dr. Orth's partner at Orthopedic Surgeons, Inc. on August 23, 2016. The day before the August 23, 2016 appointment with Dr. Orth's office, Templeton's mother contacted the University of Kansas Medical System to make an appointment with an infectious disease doctor, Dr. Albert Eid. This appointment was scheduled for September 1, 2016.

On August 29, 2016, Templeton returned to see Dr. Orth for follow-up care. Dr. Orth wrote Templeton a prescription for Naproxen and wanted to "see how he progresses with that" and Dr. Orth advised Templeton that he would "see him in a month at least."

On September 1, 2016, Templeton went to see Dr. Albert Eid, an infectious disease doctor at KU Medical Center. On September 2, 2016, Dr. Eid wrote a letter to Dr. Orth regarding the September 1, 2016 office visit. Following Dr. Eid's meeting with Templeton on September 1, 2016, Dr. Eid placed an order for an orthopedic consult at the University of Kansas Hospital.

As a result of Dr. Eid's orthopedic consult order, on September 7, 2016, Templeton saw Dr. Michael Tilley, an orthopedic doctor at KU Medical Center. During

6

the September 7, 2016 meeting, Dr. Tilley reviewed Templeton's course of treatment with Dr. Orth. Dr. Tilley's chart entry for that date stated:

> [I] had a lengthy discussion with the patient and his mother. I think he would have two options at this point in time. His first option would consist of prolonged suppressive antibiotic therapy. He has had what appears to be an appropriate course of IV antibiotics followed by oral antibiotics, which is probably suppressing things somewhat at this point in time; however, with this, the problem will not go away and this is something he will likely need to manage for the rest of his life. His other option would be to the stop the antibiotics and see if things worsen. If things were to worsen, this would confirm that this is most likely infectious related, which I do think is the case. We would then plan for a very aggressive series of surgical debridements with delivery of high concentrated local antibiotics to the area.

Without contacting or consulting Dr. Orth, Templeton stopped taking his antibiotics and the infection got worse.

Dr. Tilley saw Templeton again on October 10, 2016. Dr. Tilley reviewed Templeton's current infection symptoms and determined that an MRI scan and the possibility of surgery would need to be performed the following day. Neither Dr. Tilley nor Templeton shared or consulted with Dr. Orth regarding Dr. Tilley's recommended course of treatment for Templeton on October 11, 2016. On October 11, 2016, Templeton returned to the University of Kansas Hospital at the direction of Dr. Tilley and an MRI scan was performed. The University of Kansas Hospital radiologist, upon review of the images, noted two mass effects within Templeton's right thigh. In light of the MRI scan, Dr. Tilley consulted with Templeton, and performed surgery for an arthrotomy and debridement of the right knee and thigh on October 11, 2016. During the course of the

7

surgery on October 11, 2016, Dr. Tilley discovered two separate and independent foreign bodies (pieces of wood) in Templeton's leg.

Templeton continued to be treated and cared for by Dr. Tilley and the University of Kansas Hospital after the October 11, 2016 surgery. The last time Templeton spoke with Dr. Orth was on August 29, 2016. Templeton did not schedule any appointments with Dr. Orth after that date.

Templeton filed a Petition for Damages against Dr. Orth and Orthopedic Surgeons, Inc. in the trial court on October 9, 2018. Templeton alleged that Dr. Orth was negligent in his failure, among other things, to:

- appropriately recognize, evaluate, treat and otherwise resolve Templeton's condition beginning with Dr. Orth's first surgery on Templeton on September 18, 2012, and continuing thereafter in 2015 and 2016;

- find the wood in Templeton's right medial and lateral thigh and remove it, or, at minimum, refer Templeton to someone who could;

- properly evaluate Templeton's conditions;

- perform the proper operative procedures;

- listen to Templeton and react appropriately when Templeton told Dr. Orth in 2012, 2015, and 2016 that his pain emanated from his thigh;

- perform operative procedures on Templeton in ways that complied with the requisite standard of care.

Dr. Orth and Orthopedic Surgeons, Inc. filed separate Answers on December 10, 2018, pleading, among other things, that Templeton's cause of action was time-barred by the two-year statute of limitations in section 516.105.

8

Thereafter, Dr. Orth and Orthopedic Surgeons, Inc. moved for summary judgment, reiterating their contention that Templeton's medical negligence claim was barred by the two-year statute of limitations in section 516.105. Specifically, they argued that Templeton's care and treatment with Dr. Orth was terminated in 2012 when Templeton was released from Dr. Orth's care, and that Templeton terminated the 2015-2016 physician-patient relationship with Dr. Orth when he sought care and treatment from another orthopedic physician, and when he failed to follow-up with Dr. Orth for additional care or to keep Dr. Orth advised of his need for ongoing care after the August 29, 2016 office visit. Templeton opposed the summary judgment motion on the grounds that the continuing care and treatment tolling exception tolled the accrual of the applicable statute of limitations until October 10, 2016, when Templeton claims he manifested his decision to terminate his relationship with Dr. Orth and to have Dr. Tilley take over his continuing care and treatment. Templeton thus contends that he timely filed his lawsuit on October 9, 2018.

At a hearing on the motion, the trial court heard the arguments of counsel and took the matter under advisement. The trial court entered its judgment on April 12, 2022, granting Dr. Orth and Orthopedic Surgeons, Inc.'s motion for summary judgment, finding as a matter of law that Templeton's medical malpractice lawsuit was barred by the two-year statute of limitations in section 516.105.

Templeton timely appealed.

9

## Standard of Review

In *Green v. Fotoohighiam*, 606 S.W.3d 113 (Mo. banc 2020), the Missouri

Supreme Court outlined the standard of review for summary judgment:

> The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo*. In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper. Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. The facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. Only genuine disputes as to material facts preclude summary judgment. A material fact in the context of summary judgment is one from which the right to judgment flows.
>
> . . . .
>
> The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record.

*Id*. at 115-16 (quoting *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 452-53 (Mo. banc

2011)). "'In addition, the non-movant must support denials with specific references to

discovery, exhibits, or affidavits demonstrating a genuine factual issue for trial.

Rule 74.04(c)(2), (c)(4). Facts not properly supported under Rule 74.04(c)(2) or (c)(4)

are deemed admitted.'" *Id*. at 116 (quoting *Cent. Trust & Inv. Co. v. Signalpoint Asset

Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. banc 2014)).

"Normally, the running of the statute is a question of law for the court to decide."

*Lomax v. Sewell*, 1 S.W.3d 548, 552 (Mo. App. W.D. 1999). "Such questions of law are

granted *de novo* appellate review with no deference being paid to the trial court's

10

determination of law." *Straub v. Tull*, 128 S.W.3d 157, 159 (Mo. App. S.D. 2004).

"However, when contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question of fact for the jury to decide." *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 585 (Mo. banc 2006), as modified on denial of reh'g (Aug. 22, 2006) (quoting *Lomax*, 1 S.W.3d at 552-53).

## Analysis

In Templeton's sole point on appeal, he asserts that the trial court erred in granting Dr. Orth and Orthopedic Surgeons, Inc.'s[5] motion for summary judgment on the basis of the statute of limitations. Though Templeton concedes that the material facts relevant to determining whether the statute of limitations has run are not in dispute, he argues that different conclusions can be reasonably drawn from the uncontested facts precluding the entry of summary judgment as a matter of law.

We agree that Templeton's claims relating to Dr. Orth's medical care in 2012 are time-barred. However, we conclude that Templeton's claims relating to Dr. Orth's medical care and treatment in 2015-2016 are not time-barred because the undisputed facts support competing reasonable inferences about whether Templeton terminated his relationship with Dr. Orth on or before October 10, 2016, precluding the entry of summary judgment as a matter of law.

---

[5] For ease of reference, Dr. Orth and Orthopedic Surgeons, Inc. are collectively hereinafter referred to as "Dr. Orth."

**Medical Malpractice Statute of Limitations**

"Under Missouri law, medical malpractice actions must generally be brought within two years of the date of the alleged act of negligence." *Newton v. Mercy Clinic E. Cmtys.*, 596 S.W.3d 625, 627 (Mo. banc 2020) (citing § 516.105.1). The two-year statute of limitations may be tolled under four circumstances. *Id*. "Three of the exceptions are statutory: (1) when a foreign object is left in the body,[6] (2) when there is a negligent failure to inform the patient of medical test results, and (3) when the person bringing the action is a minor younger than 18 years of age." *Id*. (citing § 516.105(1)-(3)). None of these statutory exceptions apply in this case.

"The fourth exception, commonly referred to as the continuing care exception, arises out of common law" and is the exception on which Templeton relies. *Id*. The Missouri Supreme Court first recognized the continuing care tolling doctrine in *Thatcher v. De Tar*, 173 S.W.2d 760 (Mo. 1943). In that case, the Court explained that "the statute does not commence running until treatment by the physician or surgeon has terminated, where the treatment is continuing and of such nature as to charge the medical man with the duty of continuing care and treatment which is essential to recovery." *Id*. at 762. "This exception is to ensure that a patient—facing the short statute of limitations imposed by statute—is not faced with the impossible choice of either disturbing a course of

---

[6] This exception actually refers to a physician "introducing and negligently permitting any foreign object to remain within the body of a living person . . . ." § 516.105(1). Here, there is no allegation that Dr. Orth "introduced" the foreign object into Templeton's leg.

12

treatment by initiating suit against a caregiver or losing a viable cause of action."

*Newton*, 596 S.W.3d at 627.

In *Weiss v. Rojanasathit*, 975 S.W.2d 113 (Mo. banc 1998), the Missouri Supreme Court addressed the *Thatcher* exception more thoroughly. *Newton*, 596 S.W.3d at 627. The Court explained:

> The duty to attend the patient continues [and, therefore, the statute of limitations is tolled] so long as required unless the physician-patient relationship is ended by (1) the mutual consent of the parties, (2) the physician's withdrawal after reasonable notice, (3) the dismissal of the physician by the patient, or (4) the cessation of the necessity that gave rise to the relationship. Absent good cause to the contrary, where the doctor knows or should know that a condition exists that requires further medical attention to prevent injurious consequences, the doctor must render such attention or must see to it that some other competent person does so until termination of the physician-patient relationship.

*Weiss*, 975 S.W.2d at 119-20 (internal citations omitted). The first sentence of the quoted portion from *Weiss* describes "how long the duty of continuing care (and, therefore, the tolling of the statute of limitations) lasts." *Newton*, 596 S.W.3d at 628. Under *Weiss*, a physician's "duty to [provide continuing care for] the patient continues *so long as required[.]*" *Weiss*, 975 S.W.2d at 119 (emphasis added). "The fourth method set out in *Weiss* is the outer limit to which the duty of 'continuing care' can extend—*i.e.*, a physician's duty to provide continuing care to the patient is 'required' until the necessity that gave rise to the care relationship has ended." *Newton*, 596 S.W.3d at 628. "The other three methods set forth in *Weiss* are simply ways in which the duty to provide continuing care can terminate prior to the cessation of the necessity that gave rise to that duty." *Id*. In other words, "the duty to provide 'continuing care' ends when the necessity

13

that gave rise to that duty has ended unless, before the cessation of that necessity, the parties terminate that duty by jointly agreeing to end the relationship, the physician withdraws after reasonable notice, or the patient dismisses the physician." *Id*. Of consequence in this case, "the date on which the necessity that gave rise to the duty ended[ ] is to be determined using an objective standard without inquiry into what the physician knew or should have known." *Id.* "[T]he second sentence [of the quoted portion from *Weiss*] merely describes what '[t]he duty to attend the patient' entails, which is not at issue in this case." *Id.*

"A party who moves for summary judgment on the basis of a statute of limitations bears the burden of showing that the statute bars the plaintiff's claims." *White v. Zubres*, 222 S.W.3d 272, 274 (Mo. banc 2007). Here, Templeton's petition was filed more than two years after the last care provided by Dr. Orth on August 29, 2016, and thus more than two years after any date that could be alleged as an act of negligence supporting a claim for malpractice. The burden thus shifts to Templeton to prove that his action comes within an exception to the statute of limitations. *Id*.

Templeton's malpractice claims against Dr. Orth and Orthopedic Surgeons, Inc. arose out of the alleged negligent care Dr. Orth provided during two discrete periods: 2012 and 2015-2016. Accordingly, we separately address each of these treatment periods for statute of limitations purposes.

### 2012 Care and Treatment

Dr. Orth and Templeton's physician-patient relationship commenced on September 18, 2012, when Dr. Orth performed a right knee arthroscopy with arthroscopic

14

lavage, irrigation and debridement to the patella, quadriceps tendon repair, and medial retinacular tear. After Templeton was discharged from the hospital, he returned to Dr. Orth and Orthopedic Surgeons, Inc. on October 18, 2012, November 8, 2012, and December 6, 2012. Following Templeton's visit with Dr. Orth on December 6, 2012, Dr. Orth entered the following statement into Templeton's clinic note: "I am releasing him from my care . . . ." Dr. Orth did not provide any medical care or treatment to Templeton, of any sort, in the years 2013, 2014 and most of 2015. Well more than two years passed between the care provided by Dr. Orth in 2012 and the date Templeton filed his petition alleging medical malpractice related to that care on October 9, 2018.

Templeton argued before the trial court, and in his appellate briefing, that despite the lapse of time between his treatment with Dr. Orth in 2012, and his return to see Dr. Orth in December 2015, the continuing care and treatment exception applies to toll the statute of limitations because he returned to Dr. Orth for the same condition for which he was being treated in 2012. We disagree.

"In cases where continuing care tolled the statute, . . . plaintiffs [were] returning to medical defendants within two years of alleged malpractice." *Hooe v. St. Francis Med. Ctr.*, 284 S.W.3d 738, 739 (Mo. App. S.D. 2009) (citing *Montgomery v. S. Cnty. Radiologists, Inc.*, 49 S.W.3d 191, 193 (Mo. banc 2001) (clinic interpreted patient's additional MRIs five months later); *Thatcher*, 173 S.W.2d at 761 (patient's post-operative care continued for additional years); *Cole v. Ferrell-Duncan Clinic*, 185 S.W.3d 740, 742 (Mo. App. S.D. 2006) (patient saw physician eleven months later); *Reynolds v. Dennison*, 981 S.W.2d 641, 642-43 (Mo. App. S.D. 1998) (patient saw physician seven months

later); *Adams v. Lowe*, 949 S.W.2d 109, 110 (Mo. App. E.D. 1997) (patient saw dentist seven months later); *RCA Mut. Ins. Co. v. Sanborn*, 918 S.W.2d 893, 895-96 (Mo. App. S.D. 1996) (patient had second surgery eight months later). *Cf. Shah v. Lehman*, 953 S.W.2d 955, 958 (Mo. App. E.D. 1997) ("A 9-year lapse between treatments does not constitute 'continuing care.'").

Here, more than three years passed between Templeton's care with Dr. Orth in 2012, and his return to see Dr. Orth in December 2015. Templeton's assertion that the care in 2015 was necessitated by alleged malpractice committed in 2012 is insufficient to sustain his burden to establish that the continuing care exception applies to toll the statute of limitations with respect to the care provided in 2012:

> If treatment for consequences resulting from medical negligence were part of the doctor's duty of continuing care and served to toll the statute of limitations for so long as necessary to treat such consequences, then the continuing care tolling doctrine would simply be another name for the discredited discovery doctrine because the patient would not return for such treatment unless and until he or she discovered there were consequences necessitating treatment.

*Newton*, 596 S.W.3d at 629. "As *Newton* makes clear, 'continuing care' only exists if a patient is actually receiving continuing treatment from the health-care provider for the condition on which the claim of negligence is based." *Tiemann v. SSM Reg'l Health Servs.*, 632 S.W.3d 833, 846 (Mo. App. W.D. 2021). "*Newton* specifies that 'continuing care' is not established merely because the patient later requires treatment for complications arising from the health-care provider's negligence, or because the health-care provider knew, or should have known, of the patient's need for further treatment." *Id.* at 846 (citing *Newton*, 596 S.W.3d at 628-29).

16

The uncontroverted material facts are that Dr. Orth released Templeton from care on December 6, 2012, and did not provide any sort of medical care or treatment to Templeton in the years 2013, 2014, and most of 2015. Continuing care is not established merely because Templeton returned to Dr. Orth in 2015 for treatment for complications arising out of the same incident that led to the course of treatment in 2012. *Tiemann*, 632 S.W.3d at 846. Templeton had two years from December 6, 2012, to file suit with respect to malpractice alleged to have occurred in 2012.[7] Templeton did not file his Petition for Damages until October 9, 2018. Templeton's claims relating to Dr. Orth's medical care in 2012 are thus time-barred, and the trial court properly granted summary judgment with respect to those claims.[8]

### 2015-2016 Care and Treatment

We reach a different conclusion concerning the timeliness of Templeton's claims with respect to Dr. Orth's medical care in 2015-2016. The uncontroverted facts establish that Templeton was treated by Dr. Orth between December 10, 2015, and August 29, 2016. The acts of negligence on which Templeton relies to assert malpractice against Dr. Orth occurred within that temporal window of time. The uncontroverted facts establish that Templeton's petition was filed on October 9, 2018, more than two years

---

[7] Though Templeton was less than eighteen years of age when he was treated by Dr. Orth in 2012, he turned twenty years of age on September 23, 2014, before the two-year statute of limitations expired for the care provided in 2012. Thus, the running of the statute of limitations was not tolled. *See* section 516.105.1(3).

[8] During oral argument, Templeton conceded that the statute of limitations has run with respect to claims of medical malpractice by Dr. Orth in 2012. We have nonetheless explained why the trial court's grant of summary judgment must be affirmed with respect to claims of malpractice by Dr. Orth in 2012 to avoid any confusion on remand.

after the last date on which Dr. Orth provided any treatment for Templeton. The burden thus shifts to Templeton to prove that his action for medical malpractice arising out of acts of negligence between December 10, 2015, and August 29, 2016, is subject to an exception that tolls the statute of limitations. *White*, 222 S.W.3d at 274. Specifically, Templeton has the burden to establish that an exception applies to toll the running of the statute of limitations at least until October 9, 2016, two years before his Petition for Damages was filed.

Once again, Templeton relies on the continuing care exception. He alleges that his treatment by Dr. Orth beginning in December 2015 carried with it a duty to attend to his care that continued so long as required, and that care was required for the medical issues Templeton was dealing with in 2015 through at least October 9, 2016.

Dr. Orth's motion for summary judgment does not contend that the continuing care exception was not triggered by the medical conditions which brought Templeton into Dr. Orth's care in December 2015. And Dr. Orth's motion for summary judgment does not dispute that Templeton's medical conditions continued to require care after August 29, 2016, and, in fact, through at least October 9, 2016. Dr. Orth alleges, however, that the duty to provide continuing care to Templeton terminated on or before October 9, 2016, because Templeton's physician-patient relationship with Dr. Orth was effectively terminated by Templeton on or before October 9, 2016.

The question thus squarely framed is whether the undisputed facts establish, as a matter of law, that Templeton terminated his physician-patient relationship with Dr. Orth on or before October 9, 2016, so as to trigger an exception to application of the

18

continuing care tolling doctrine. Templeton concedes that he manifested an intent to terminate his physician-patient relationship with Dr. Orth on October 10, 2016—the date Dr. Tilley recommended an MRI scan and possible surgery on October 11, 2016, and Templeton agreed to such treatment recommendations. But, he argues that the undisputed facts relating to his course of care and treatment prior to that date do not establish, as a matter of law that he had dismissed Dr. Orth as his physician prior to October 10, 2016.

The application of the four exceptions to the continuing case tolling doctrine is an objective inquiry. *See Newton*, 596 S.W.3d at 628 (holding that the fourth exception to the continuing care tolling doctrine, which requires a cessation of the necessity that gave rise to the physician-patient relationship, "is to be determined using an objective standard without inquiry into what the physician knew or should have known").[9]

Employing an objective standard, the uncontroverted material facts are that Templeton began seeing Dr. Orth on December 10, 2015. On March 25, 2016, Templeton underwent an arthroscopy of the right knee with a three-compartment

---

[9] No Missouri case has addressed whether the burden shifts back to the party asserting the statute of limitations to prove that an exception to the continuing care tolling doctrine applies once a party defending application of the statute of limitations sustains their burden to establish the exception, or whether the burden to establish the continuing care tolling doctrine exception carries with it the burden to establish that no exceptions to the doctrine apply. We need not decide that issue at this time, as regardless who bears the burden to prove the applicability (or inapplicability) of an exception to the continuing care tolling doctrine, we would nonetheless conclude, as explained in this opinion, that because the undisputed material facts support competing reasonable inferences about whether Templeton terminated his relationship with Dr. Orth on or before October 9, 2016, the issue becomes one of fact to be resolved by the jury.

synovectomy, synovial biopsy, and chondroplasty of the patella. Templeton saw Dr. Orth on five occasions thereafter, until an MRI was ordered by Dr. Orth on May 25, 2016. In addition, on May 26, 2016, Templeton was referred by Dr. Orth to a rheumatologist. Based on the results of the MRI, Dr. Orth performed a right knee arthrotomy on Templeton on May 27, 2016. Templeton was hospitalized for sixteen days after this surgery, and Dr. Orth performed another surgery during that time on June 5, 2016. After his release from the hospital, Templeton returned to see Dr. Orth on multiple occasions up to and including August 18, 2016. On that date, Dr. Orth prescribed Bactrim. On August 22, 2016, Dr. Orth ordered another MRI scan due to right thigh pain and infection. The next day, Dr. Orth's partner discussed the MRI results with Templeton and his mother. The day before this August 23, 2016 appointment, Templeton's mother contacted the University of Kansas Medical System to make an appointment with an infectious disease doctor, Dr. Eid. Before seeing Dr. Eid, Templeton returned to Dr. Orth on August 29, 2016, at which time Dr. Orth prescribed Naproxen to "see how he progresses," and noted that he would see Templeton "in a month at least."

On September 1, 2016, Templeton and his mother had an appointment with Dr. Eid at the University of Kansas Hospital. A review of the September 1, 2016 patient encounter with Dr. Eid was sent to Dr. Orth's office. Following this September 1, 2016 meeting with Templeton, Dr. Eid placed an order for an orthopedic consult at the University of Kansas Hospital.

On September 7, 2016, Templeton and his mother returned to the University of Kansas Hospital and met with Dr. Michael Tilley, an orthopedic surgeon from the

20

University of Kansas Hospital. During the September 7, 2016 meeting, Dr. Tilley reviewed Templeton's course of treatment with Dr. Orth. Following this review, Dr. Tilley and Templeton discussed Templeton's current prognosis and one option "to stop the antibiotics and see if things worsen," a worsening of which "would confirm that this is most likely infectious related," in which case Dr. Tilley's recommendation would be to "plan for a very aggressive series of surgical debridements with delivery of high concentrated local antibiotics to the area." Without contacting or consulting Dr. Orth, Templeton stopped taking the antibiotics and, in fact, his infection worsened.

Dr. Tilley saw Templeton on October 10, 2016 and, after confirming that the infection had worsened, recommended an MRI scan and the possibility of surgery the following day. Templeton agreed to Dr. Tilley's treatment recommendations of October 10, 2016. This recommended course of treatment was not shared with Dr. Orth. On October 11, 2016, Templeton underwent surgery performed by Dr. Tilley because the MRI noted two mass effects in the right thigh. During the surgery, two pieces of wood were removed from Templeton's right thigh. Templeton continued his care and treatment with Dr. Tilley thereafter. Templeton had no contact with Dr. Orth or Dr. Orth's office after August 29, 2016, and never scheduled a follow-up appointment with Dr. Orth after that date.

Because the "dismissal of the physician by the patient" exception to the continuing care tolling doctrine is to be determined by an objective standard, the statute of limitations issue can be decided by the court as a matter of law where the relevant material facts are uncontested. *Powel*, 197 S.W.3d at 585 ("Because the capable of

21

ascertainment standard is an objective one, where relevant facts are uncontested, the statute of limitations issue can be decided by the court as a matter of law."). However, our review of the grant of summary judgment requires us to view the record in the light most favorable to the party against whom summary judgment was entered, and in doing so, to afford that party the benefit of all reasonable inferences from the record. *Green*, 606 S.W.3d at 115-16. Where competing reasonable inferences can be drawn from undisputed facts as to whether the statute of limitations has run, that issue becomes a question of fact for the jury to decide. *Powel*, 197 S.W.3d at 585 (citing *Lomax*, 1 S.W.3d at 552-53).

Here, Dr. Orth argues that the only reasonable inference that can be drawn from the undisputed facts is that Templeton dismissed Dr. Orth as his physician on or before October 9, 2016, based on the combination of unilaterally seeking a new care team, of never returning to see Dr. Orth or otherwise keeping Dr. Orth advised of his condition after August 29, 2016, and by cessation of the Bactrim prescribed by Dr. Orth as recommended by Dr. Tilley to ascertain if Templeton's condition was infection related. Conversely, Templeton argues that it can be reasonably inferred that although he was seeking input in the nature of a second opinion when he contacted Dr. Eid, and then began seeing Dr. Tilley, he did not manifest an intent to dismiss Dr. Orth as his physician until October 10, 2016, when Dr. Tilley recommended another MRI with the prospect that additional surgery might be required and Templeton agreed to accept Dr. Tilley's recommended course of treatment at that time. For, had the infection not worsened after

22

stopping the intake of antibiotics, Templeton argues that he would have returned to the physician that had been his doctor for years—Dr. Orth.

Whether argued inferences to be drawn from undisputed facts are reasonable inferences is a question of law. *See, e.g., Porter v. Toys 'R' Us-Delaware, Inc.*, 152 S.W.3d 310, 316 (Mo. App. W.D. 2004) (holding that whether the inferences drawn from evidence in a case are reasonable is a question of law). We cannot say as a matter of law that the competing inferences argued by the parties to be drawn from the undisputed material facts in this case are unreasonable inferences.[10] "The parties do not dispute the basic facts—who took what actions. The real dispute lies in the reason for the actions . . . and thus whether the actions constitute" the dismissal of Dr. Orth as of the respective dates each party argues. *Robinson v. Lagenbach*, 439 S.W.3d 853, 860 (Mo. App. E.D. 2014).

This principle is of particular import here. The dissent suggests that Templeton's decision to suspend taking Bactrim as prescribed by Dr. Orth permits only one reasonable inference—that Templeton terminated the physician-patient relationship at the moment he suspended taking a prescribed medication. Though we agree that the failure to follow a physician's instruction supports a reasonable inference that a patient has terminated the

---

[10] Though it is undisputed that Templeton failed to make an appointment to return to Dr. Orth's office within "a month at least" of his August 29, 2016 appointment with Dr. Orth, the failure to return for continued treatment as instructed does not terminate the physician-patient relationship and start the running of the statute of limitations unless Templeton failed to return within a reasonable time after August 29, 2016. *See Weiss*, 975 S.W.2d at 120. We cannot say, as a matter of law, that Templeton's failure to return to Dr. Orth by October 9, 2016, constitutes the failure to return within a reasonable time of his August 29, 2016 appointment.

physician-patient relationship, we do not agree that the failure to follow a physician's instruction mandates the conclusion that a patient has terminated the physician-patient relationship as a matter of law. To so conclude ignores undisputed facts in this case about *why* Templeton was advised to suspend taking Bactrim. Here, the undisputed facts establish that Dr. Tilley's suggestion that Templeton suspend Bactrim was designed to provide Templeton with information that would permit Templeton to decide between two options for his continuing care, one of which could have included continuing his care with Dr. Orth. Under the undisputed facts of this case, it cannot be said, as a matter of law, that Templeton's decision to suspend Bactrim permitted no reasonable inference other than an intent to terminate the relationship with Dr. Orth.

Choosing among competing inferences "is not permitted at the summary-judgment stage." *Id*. "[W]hen different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question of fact for the jury to decide." *Norman v. Lehman*, 347 S.W.3d 611, 614 (Mo. App. E.D. 2011).[11]

_____

[11] Dr. Orth and Orthopedic Surgeons, Inc. also argue that *Norman v. Lehman*, 347 S.W.3d 611 (Mo. App. E.D. 2011), reaffirmed the Missouri Supreme Court's findings in *Weiss* that the failure to return for continued treatment terminated the physician-patient relationship and started the running of the statute of limitations. We disagree. The court in *Norman* did not affirm a fifth bright-line test terminating the physician-patient relationship. Rather, the court reviewed the continuing care exception as espoused in *Weiss* and concluded that material facts were in dispute as to when Norman's relationship with Dr. Lehman ended, thus starting the running of the statute of limitations. *Id*. at 615. The parties agreed that Dr. Lehman last examined and treated Norman on November 7, 2006, but the record did not show whether Norman made another appointment with Dr. Lehman for the continuing care both contemplated. *Id*. The court also concluded that material facts were in dispute as to whether Norman created a new physician-patient relationship with a second doctor on November 10, 2006, when someone contacted the second doctor's office to arrange for the doctor to evaluate Norman. *Id*. The court found

Because the ultimate issue of when Templeton terminated the physician-patient relationship with Dr. Orth is susceptible to competing reasonable inferences drawn from undisputed facts, it was error for the trial court to conclude as a matter of law that Templeton's claimed malpractice in 2015-2016 was time-barred.

Point I is denied in part and granted in part.

## Conclusion

The trial court's judgment is affirmed in part with regard to the running of the statute of limitations with respect to malpractice that is alleged to have occurred in 2012; the trial court's judgment is reversed in part with regard to the running of the statute of limitations with respect to the malpractice that is alleged to have occurred in 2015-2016; and the cause is remanded for further proceedings consistent with this opinion.

/s/ *Mark D. Pfeiffer*
_____
Mark D. Pfeiffer, Judge

Cynthia L. Martin, Judge, concurs.
Thomas N. Chapman, Presiding Judge, dissents in separate opinion.

---

that the trial court's legal conclusion that Dr. Lehman's duty of continuing care ended on November 7, 2006, rested on disputed material facts, and summary judgment was improper. *Id.*

25


DANE TEMPLETON,            )
                                      )    **WD85405**
               **Appellant,**    )
**v.**                                )    **FILED: April 4, 2023**
                                        )
**CHARLES ORTH, D.O., AND**    )
**ORTHOPEDIC SURGEONS, INC.,**  )
                                        )
           **Respondents.**   )

## DISSENTING OPINION

I respectfully dissent from the majority opinion's reversal of summary judgment in favor of the Defendants regarding medical malpractice alleged to have occurred in 2015-2016. I would affirm the trial court's judgment in its entirety.

I have very little quarrel with the factual and procedural background set forth in the majority opinion, which, in pertinent part, is as follows. Templeton's last visit to Dr. Charles Orth's office was on August 29, 2016. At that visit, Templeton was directed to continue taking the antibiotic Bactrim (which Dr. Orth had previously prescribed), and in his note, Dr. Orth indicated that he would "see him a month at least." Three days later, on September 1, Templeton, on his own

initiative (without referral by Dr. Orth) met with Dr. Albert Eid (an infectious disease doctor) who, in turn, referred Templeton to Dr. Michael Tilley, an orthopedic doctor a KU Medical Center.[1]

On September 7, Templeton was examined by Dr. Tilley, who then directed Templeton to stop taking the Bactrim on September 20, and to return to his office two weeks later. The majority correctly notes a portion of Dr. Tilley's September 7 note, which indicated, among other things, the two options then available – to continue with prolonged suppressive antibiotic therapy, or to stop the antibiotics, and, if things worsen (which would confirm the problem was infection related) he "[w]ould then plan for a very aggressive series of surgical debridements with delivery of high concentrated local antibiotics to the area."

However, in addition, Dr. Tilley's September 7 notes goes on to say:

> I think once everything has been debrided adequately, we could potentially repair the retinaculum at that time. This most likely can be repaired. If this is something that cannot be repaired, this is something that could potentially be done in the future. I think if he were to stop the antibiotics and things were to remain the same, we may need to reconsider some things.
> At this point in time I would recommend stopping his antibiotics and see if things worsen. We will plan for him to come off his antibiotics on the 20th. He will returns (sic) 2 weeks after stopping his antibiotics and we will reassess things at that point in time….If he starts having increasing fevers, chills, night sweats, swelling, warmth, pain, redness, he is to call the office and we can make arrangements for him to return sooner.

---

[1] Dr. Eid sent Dr. Orth his progress notes from the September 1 visit with Templeton.

Notably, nothing in Dr. Tilley's September 7 note suggests that Templeton should report back to Dr. Orth, whether or not things worsened after the antibiotics were discontinued. If things did worsen "we" would plan for aggressive surgical debridement, and if things did not worsen but instead remained the same "we may need to reconsider some things." If redness, swelling, or other symptoms flared up he was "to call the office and we can make arrangements for him to return sooner."

Dr. Tilley's September 7 note goes on to indicate that Templeton was having a separate issue (not directly related to the condition in his right leg) and recommends that Templeton follow up with his primary care physician (not Dr. Orth) and get started back on the medication he was prescribed to deal with that issue. Again, nothing about returning to Dr. Orth for treatment after discontinuing his treatment plan (taking Bactrim).

Templeton did discontinue taking Bactrim and returned to see Dr. Tilley on October 10, and on the next day underwent surgery performed by Dr. Tilley.[2]

Templeton did not follow up with Dr. Orth by September 29, 2016, and, in fact, never followed up with Dr. Orth. Rather, Templeton discontinued the course

---

[2] The majority characterizes Dr. Tilley's directive to "stop taking antibiotics" as a "suspension" of taking Bactrim. However, Dr. Tilley's notes do not give any directive regarding the resumption of said antibiotic. Templeton never resumed taking the Bactrim and was never directed to do so prior to his return to see Dr. Tilley on October 10, 2016. I find no basis in the summary judgment record to conclude it was anything other than a cessation of taking Bactrim. Regardless of the characterization (be it cessation or "suspension" of said antibiotic), doing so was not in accordance with Dr. Orth's plan of care.

3

of treatment prescribed by Dr. Orth (discontinued the Bactrim). Templeton filed suit on October 9, 2018, two years and 41 days after his last appointment with Dr. Orth; two years and 32 days after his September appointment with Dr. Tilley; two years and 19 (or so) days after he discontinued following the course of treatment prescribed by Orth; and two years and 10 days after September 29, 2016.

I also have no quarrel with the majority's discussion of the applicable standard of review or its legal analysis of the two-year statute of limitations for medical malpractice actions and the continuing care doctrine set forth in *Weiss v. Rojanasathit*, 975 S.W.2d 113 (Mo. banc 1998). However, I differ with majority's conclusion, as I believe the undisputed facts, even viewed in the light most favorable to Templeton, leave only one reasonable inference: that Templeton terminated his relationship with Dr. Orth on or before September 29, 2016, by seeking the care of a different physician (Dr. Tilley on September 7, 2016), by following Dr. Tilley's plan for treatment (discontinuing Bactrim), and by thus declining to follow the course of treatment prescribed by Dr. Orth. Templeton filed suit more than two years later, and is thus barred by the two-year statute of limitations set forth under section 516.105.

I rely primarily on *Weiss* to reach that conclusion. In *Weiss*, the Plaintiff had a pap smear in April 1991, and was told she would not be contacted unless the test showed a problem. 975 S.W.2d at 116. Weiss was also told to return "in three

4

months." *Id.* The test returned abnormal, yet Weiss was not contacted, and she did not return in three months as directed. *Id.* In fact, she never returned to seek treatment. *Id.* Another doctor examined her and treated her for cancer (in February 1995). *Id.* Weiss filed suit in 1996. *Id.*

In *Weiss*, the Missouri Supreme Court indicated as follows:

> Missouri courts have recognized that the statute of limitations does not commence to run against a plaintiff patient until treatment by the medical defendant ceases. This is sometimes referred to as the continuing treatment theory and applies where the treatment is continuing and of such nature as to charge the medical man with the duty of continuing care and treatment which is essential to the recovery until the relation ceases. The duty to attend the patient continues so long as required unless the physician-patient relationship is ended by (1) the mutual consent of the parties, (2) the physician's withdrawal after reasonable notice, (3) the dismissal of the physician by the patient, or (4) the cessation of the necessity that gave rise to the relationship.

*Id.* at 119-120 (internal quotes and citations omitted). In *Weiss*, the Court concluded that Weiss's failure "to comply with the doctor's instruction and to return for continued treatment terminated the physician/patient relationship between the two and started the running of the statute within a reasonable time after July of 1991." *Id.* at 120. It found that, absent any explicit statement by the patient, the patient's conduct (failure to return when directed) ended the continuing treatment, and thus commenced the period of limitations. *Id.*

In *Norman v. Lehman*, 347 S.W.3d 611, 612 (Mo. App. E.D. 2011), the Eastern District of our court reversed summary judgment in favor of a medical

malpractice defendant. In *Norman*, the plaintiff was dissatisfied with the treatment received regarding surgery performed on his left knee. *Id.* The plaintiff last saw his treating surgeon on November 7, 2006. *Id.* A family member contacted a different orthopedic doctor on November 10, 2006, and that doctor ordered some tests in anticipation of an office visit which took place on November 14, 2006. *Id.* at 612-13. The medical malpractice suit was filed on November 12, 2008 – more than two years after the appointment with the new doctor was scheduled, but less than two years after the office visit with the new doctor. *Id.* at 613. The Eastern District found there remained a factual dispute as to when the plaintiff began treating with another doctor, and thus there remained a factual dispute as to when the patient discontinued treatment by his previous doctor (who was being sued for malpractice). *Id.* at 615. In *Norman*, there was no overt act taken by the patient (more than two years prior to filing suit) which was at variance with the course of treatment directed by the alleged medical malpractitioner. Rather, *Norman* turned entirely upon when the patient took up treatment by a different doctor, and, on that issue, the court concluded there remained a factual dispute.

In this instance, the majority seems to conflate the two means by which the patients were alleged to have dismissed their treating physicians in *Weiss* and *Norman*. In *Weiss*, the court concluded that the patient's failure to follow the directives of the treating physician (to return within the time directed or within a

6

reasonable time thereafter) discontinued the treatment, whereas, in *Norman*, the court examined whether the patient's conduct in setting an appointment with another potential treating physician and attending that appointment then (at the time of the appointment) constituted dismissal of the previous physician. In this matter, both bases that support the inference that Templeton dismissed Dr. Orth were present, as Templeton sought advice of a different physician (like the patient in *Norman*), and did not return to see Dr. Orth as directed (like the patient in *Weiss*). In addition, Templeton did something that neither patient did in either *Weiss* or *Norman* – he took a course of action (discontinuing the Bactrim) that was contrary to the plan of care prescribed by his previous doctor (Orth) and which was at the direction of the subsequent doctor (Tilley).

Had Templeton not discontinued the course of treatment prescribed by Dr. Orth (taking the Bactrim), and had Dr. Tilley's notes been less clear regarding his intention to treat Templeton (regardless of Templeton's reaction to the cessation of Bactrim), then, like *Norman*, I might agree that there remained a factual dispute whether the September 7 appointment with Dr. Tilley constituted dismissal of Dr. Orth (and thus the beginning point of the period of limitations). Likewise, had Templeton not discontinued the Bactrim, and had he merely failed to return for treatment, then I might agree that there remained a factual dispute whether the period of limitations had run when the suit was filed on October 9, 2018. Or, to

7

put it in the terms suggested by the majority, had Dr. Tilley's September 7 note been less clear (regarding the intention to treat Templeton) and had Templeton not discontinued the course of treatment prescribed by Dr. Orth (taking the Bactrim), then I might agree that there are two possible inferences that could be drawn from that conduct – that he had not yet discontinued his treatment with Dr. Orth, or that he had in fact decided to adopt Dr. Tilley as his treating physician (to the exclusion of Dr. Orth).

However, in this instance, Templeton's appointment with Dr. Tilley and his declining to follow Dr. Orth's course of treatment (discontinuing the Bactrim) lead to only one reasonable conclusion or inference – that Templeton had discontinued his treatment by Dr. Orth, and thus ended Dr. Orth's continuing care. Templeton's declining to notify Dr. Orth of his discontinuation of the Bactrim, Templeton's (and other's) declining to notify Dr. Orth of his appointments with Dr. Tilley, Dr. Tilley's September 7 note, and Templeton's failure to return for an appointment with Dr. Orth by September 29, all bolster this same inference (that he had discontinued his course of treatment with Dr. Orth more than two years before filing suit).

As the majority points out, an objective standard applies – whether a reasonable person would conclude that Templeton had discontinued his treatment by Dr. Orth. Having reviewed the summary judgment record in the light most

8

favorable to Templeton,[3] there is only one reasonable inference that may be drawn – that Templeton declined to follow Dr. Orth's continuing care directives, and had thus dismissed him in doing so, more than two years prior to filing suit. "Statutes of limitations are favored in the law and cannot be avoided unless the party seeking to do so brings himself strictly within a claimed exception." *White v. Zubres*, 222 S.W.3d 272, 276 (Mo. banc 2007) (internal quotes and citation omitted). Templeton failed to bring himself strictly within the continuing care exception to the medical malpractice statute of limitations, and, in fact, the summary judgment record clearly takes him outside the purported exception.

I would therefore find that the statute of limitations had run on all of Templeton's claims and would affirm the trial court's summary judgment in its entirety.

THOMAS N. CHAPMAN, JUDGE

---

[3] "This Court reviews the record in the light most favorable to the party against whom [summary] judgment was entered." *Newton v. Mercy Clinic E. Cmtys.*, 596 S.W.3d 625, 628 (Mo. banc 2020).